# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UTAH DINÉ BIKÉYAH**
352 S. Denver St. #315,
Salt Lake City, UT 84111;

**FRIENDS OF CEDAR MESA,**
P.O. Box 338,
300 E. Main St.,
Bluff, UT 84512;

**ARCHAEOLOGY SOUTHWEST,**
300 North Ash Alley,
Tucson, AZ 85701;

**CONSERVATION LANDS FOUNDATION, INC.,**
835 E. 2d Avenue, #314,
Durango, CO 81301;

**PATAGONIA WORKS,**
259 W. Santa Clara Street,
Ventura, CA 93001;

**THE ACCESS FUND,**
P.O. Box 17010,
Boulder, CO 80308;

**NATIONAL TRUST FOR HISTORIC PRESERVATION,**
2600 Virginia Avenue, N.W.,
Suite 1100,
Washington, DC 20037; and

**SOCIETY OF VERTEBRATE PALEONTOLOGY,**
9650 Rockville Pike,
Bethesda, MD 20814;

                    **Plaintiffs,**

        - v. —

CIVIL ACTION NO. _____

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

DONALD J. TRUMP, in his official capacity as
PRESIDENT OF THE UNITED STATES,
The White House,
1600 Pennsylvania Avenue, N.W.,
Washington, DC 20500;

RYAN K. ZINKE, in his official capacity as
SECRETARY OF THE INTERIOR,
1849 C Street, N.W.,
Washington, DC 20240;

SONNY PERDUE, in his official capacity as
SECRETARY OF AGRICULTURE,
1400 Independence Avenue, S.W.,
Washington, DC 20250;

BRIAN STEED, in his official capacity as DEPUTY
DIRECTOR OF THE BUREAU OF LAND
MANAGEMENT EXERCISING THE AUTHORITY
OF THE DIRECTOR,
1849 C Street, N.W.,
Room 5665,
Washington, DC 20240; and

TONY TOOKE, in his official capacity as CHIEF OF
THE UNITED STATES FOREST SERVICE,
1400 Independence Avenue, S.W.,
Washington, DC 20250;

                    Defendants.

## INTRODUCTION

1.      Plaintiffs Utah Diné Bikéyah, Friends of Cedar Mesa, Archaeology Southwest, Conservation Lands Foundation, Inc., Patagonia Works, The Access Fund, the National Trust for Historic Preservation, and the Society of Vertebrate Paleontology, on behalf of themselves, their members, and other affiliates ask this Court to declare unlawful President Trump's December 4, 2017 proclamation that revoked the Bears Ears National Monument and replaced it with two new "units." The President's action exceeded Congress' delegation of authority to him in the Antiquities Act of 1906 ("the Antiquities Act"), 54 U.S.C. §§ 320301, *et seq.*, and violates the Property Clause and Take Care Clause of the Constitution.  U.S. Const. art. IV, § 3, cl. 2; *id.* art. II, § 3, cl. 5.  In the 111-year history of the Antiquities Act, no president has ever reversed a prior president's monument by wholesale removal of protections for landmarks, structures, and other objects of historic or scientific interest.  Plaintiffs request that this Court enjoin implementation of the President's unlawful action and restore the original configuration of the Bears Ears National Monument to ensure fulfillment of Congress' clear intent.

2.      The President has limited authority under the Antiquities Act.  The Property Clause of the Constitution vests Congress with the sole authority to dispose of and make all needful Rules and Regulations respecting property of the United States, U.S. Const. art. IV, § 3, cl. 2, and Congress has delegated to the President, through the Antiquities Act, only the authority to create national monuments through public proclamation.  For as much authority as it gave to the President to create these monuments, Congress gave the President no authority to revoke or modify those monuments or to vacate the protections created for those monuments.  Congress is the sole authority that can undertake such changes.

3.      Pursuant to his authority under the Antiquities Act, President Barack Obama proclaimed the Bears Ears National Monument in southeastern Utah on December 28, 2016, thereby protecting a landscape named for the distinctive twin buttes rising above geologically diverse terrain that has been sacred to native peoples for hundreds of generations. *See* Proclamation 9558, 82 Fed. Reg. 1139 (Jan. 5, 2017). This new national monument had two components: a wide range of archaeological, paleontological, cultural, geographic, geological, and ecological objects designated for protection under the Antiquities Act, *see id.* at 1139-43, and a reservation of approximately 1.35 million acres of public land to be known as "the Bears Ears National Monument," *see id.* at 1143. President Obama's action came after years of public discussions and engagement to gather and consider the full range of views from government, industry, Indian tribes, non-profit representatives, and the American public. His proclamation carried the full force of Congress' delegated authority.

4.      On December 4, 2017, President Donald J. Trump signed a proclamation (the "Revocation Proclamation") purporting to erase the designation of thousands of objects of historic and scientific interest and over 1 million acres from the Bears Ears National Monument. *See Presidential Proclamation Modifying the Bears Ears National Monument*, WhiteHouse.gov (Dec. 4, 2017), https://www.whitehouse.gov/the-press-office/2017/12/04/presidential-proclamation-modifying-bears-ears-national-monument. President Trump's proclamation is unlawful. It exceeds the limits on the President's authority under the Antiquities Act and arrogates to the President authority reserved to Congress by the Constitution. The President has acted *ultra vires*.

## JURISDICTION AND VENUE

5.      Plaintiffs' claims arise under the Antiquities Act, 54 U.S.C. §§ 320301-320303,

the National Landscape Conservation System, 16 U.S.C. §§ 7201-7203, the Property Clause of the United States Constitution, U.S. Const. art. I, § 3, cl. 2, and the Take Care Clause of the United States Constitution, U.S. Const. art. II, § 3, cl. 5. These claims concern the scope of the President's authority to revoke a national monument. As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(e) because Defendants reside in the District of Columbia and a substantial part of the events or omissions giving rise to this action occurred in the District of Columbia. Upon information and belief, a substantial part of the development of the two Presidential Proclamations at issue in this litigation, as well as the issuance of Proclamation 9558, occurred in the District of Columbia. Advocacy work performed by Plaintiffs in support of President Obama's Proclamation 9558 occurred in the District of Columbia. Plaintiff National Trust for Historic Preservation maintains its headquarters in the District of Columbia, and Plaintiff Conservation Lands Foundation maintains an office in the District of Columbia to assist its advocacy efforts.

7. The requested relief is proper under 28 U.S.C. §§ 2201-2202 and Article III of the Constitution of the United States.

## PARTIES

### I. Plaintiffs

**Conservation Lands Foundation, Inc.**

8. Conservation Lands Foundation, Inc. ("CLF") promotes conservancy of public lands through supporting the National Landscape Conservation System (or the "National Conservation Lands") and preserving the outstanding historic, cultural, and natural resources of those public lands. The National Conservation Lands encompass approximately 36 million acres and 2,400 river miles of National Monuments, National Conservation Areas, Wilderness and

Wilderness Study Areas, Wild and Scenic Rivers, National Scenic and Historic Trails, and other special designations. Congress expressly recognized and codified the existence of the National Conservation Lands in 2009, *see* Omnibus Public Land Management Act of 2009, Pub. L. 111-11, 123 Stat. 991 (2009) (codified as 16 U.S.C. §§ 7201-7203), and mandated that those units be managed in accordance with the statute or proclamation establishing them.

9.     CLF is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of the State of Delaware, and headquartered in Durango, Colorado. CLF maintains regional offices in the District of Columbia and five states. Upon information and belief, CLF is the only non-profit in the country specifically dedicated to establishing and safeguarding National Conservation Lands under the care of the Bureau of Land Management ("BLM"). To fulfill its purpose, CLF works to protect, restore, and expand the National Conservation Lands through education, advocacy, and partnership. The Bears Ears National Monument is now a unit of the National Conservation Lands, and the management of and authority for appropriations to the Bears Ears National Monument are governed in part by the Omnibus Public Land Management Act of 2009.

10.    Critical to CLF's success and mission is CLF's Friends Grassroots Network. CLF's founding organizational vision was to combine local grassroots power with a sophisticated national strategy that would include dedicated staff and resources to educate Congress, the Executive Branch, and the public about the National Conservation Lands. CLF provides individual groups with technical advice, mentoring, tools, and training to ensure successful on-the-ground projects; CLF also offers guidance to groups on effective advocacy and community education. CLF's resources and expertise in government relations, advocacy, communications, and outreach provide local advocates with insights into developments affecting

4

the National Conservation Lands, including the Bears Ears National Monument, as well as the tools needed to influence those developments powerfully and persuasively.

11.     Designation of the Bears Ears National Monument has been a central initiative of CLF's for more than five years. CLF's primary focus has been providing strategic support to the local non-profits, particularly Utah Diné Bikéyah, Archaeology Southwest, and Friends of Cedar Mesa, that played important roles in the designation effort. CLF has devoted thousands of hours of its staff time and significant resources to securing the designation of Bears Ears as a national monument.

12.     During the last 5 years, CLF provided strategic support to tribal organizations and others leading the effort to protect the Bears Ears region. CLF also undertook significant advocacy efforts of its own. CLF actively engaged in the creation of the Bears Ears National Monument by supporting and participating in the collection of critical data and information on the natural, cultural, historic, and scientific resources and values supporting the Bears Ears National Monument Proclamation, as well as engaging Department of the Interior officials (including former Secretary Jewell) regarding the significance of the Bears Ears region. CLF's efforts continue to date.

13.     CLF will suffer direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of the Bears Ears National Monument. By virtue of its mission, CLF acts as a representative for preservation of the natural cultural, historic, and scientific values of the Bears Ears National Monument and will therefore suffer immediate and irreparable injury by the revocation of the National Monument and diminution or elimination of the protections provided by the Proclamation 9558. Due to the actions of Defendants, CLF will also have no choice but to divert its limited resources away from its ongoing designation

campaigns in the states of Arizona, California, New Mexico, Colorado, Nevada, and Oregon and towards restoring protection of, and mitigating adverse impacts to, this historically and culturally significant area. CLF and the organizations it supports (*e.g.*, Friends of Cedar Mesa, Archaeology Southwest, and Utah Diné Bikéyah) will also divert resources away from important stewardship projects in the Bears Ears region. CLF will need to reallocate resources to new efforts to fight for federal protection of the Bears Ears National Monument and away from on-the-ground public stewardship projects and public education campaigns devoted to the interpretation and protection of the unique objects of scientific, cultural, and historical interest contained in the Bears Ears region.

14. CLF officers and board members regularly visit the Bears Ears region to hike, camp, and explore in the areas now protected by the Bears Ears National Monument. The objects of historic and scientific interest comprising the Bears Ears National Monument are critical to the officers' and board members' use and enjoyment of the monument.

15. Members of the entities within CLF's Friends Grassroots Network use and enjoy the Bears Ears National Monument regularly. This use includes hiking, rock climbing, rafting, backpacking, canyoneering, river running, and photographing and observing the area's unique archaeology, geology, and habitat. The objects of historic and scientific interest comprising the Bears Ears National Monument are critical to the members' use and enjoyment of the monument.

**Utah Diné Bikéyah**

16. Utah Diné Bikéyah ("UDB") is a Native American-led, values-driven organization that recognizes the deep and ongoing spiritual connection between indigenous people and the land. As an organization founded and focused on Native American traditional and cultural principles, UDB operates at the intersection between culture and conservation, by

promoting land protection that honors and includes human societies that have co-existed with ecosystems since time immemorial.

17.     UDB is a non-profit organization exempted from taxation under 26 U.S.C. § 501(c)(3), organized under the laws of the State of Utah, and headquartered in Salt Lake City, Utah.

18.     UDB is a member of CLF's Friends Grassroots Network, and, like CLF, has long been involved in stewardship and advocacy to protect the historical and natural aspects of the Bears Ears area.

19.     UDB began its work in 2010 through another 501(c)(3) non-profit, Round River Conservation Strategies, by gathering traditional cultural knowledge from Navajo elders about the Bears Ears region, information many had previously been afraid to share for fear that it would lead to the desecration and destruction of cultural resources and sacred sites throughout the area, and then sharing that information as part of the conservation initiatives spearheaded by former Senator Robert Bennett. Beginning in 2011, UDB formed itself as a separate non-profit organization. In June 2014, UDB began an effort to work with the Navajo, Hopi, Zuni, Ute Indian, and Ute Mountain Ute tribes (hereinafter collectively referred to as the "Tribes") to improve preservation of the region. By late 2015, UDB and the Tribes focused on creating a new national monument designation to protect the Bears Ears region under the Antiquities Act.

20.     As part of this effort to see a monument designation for the Bears Ears region, UDB engaged high ranking officials at the Department of Interior (then-Director of the BLM, Neil Kornze, and then-Secretary Sally Jewell), and worked to facilitate the formation of the Bears Ears Inter-Tribal Coalition, comprised of leaders from the five Tribes. Working with UDB, the Bears Ears Inter-Tribal Coalition soon crafted and presented the Bears Ears National

Monument proposal to federal officials in Washington, D.C. The National Congress of American Indians, representing 270 tribes from across the United States, later endorsed the proposal.

21.     President Obama's Proclamation 9558 establishing the Bears Ears National Monument is a significant achievement for UDB and the tribes to which UDB's members belong, in that only through the designation will tribal members (including UDB members) be assured that their traditional way of life can continue undisturbed.  The Bears Ears National Monument represents the first national monument designated under the authority of the Antiquities Act for, and at the request of, sovereign tribes.  National monument designation provides the Bears Ears area, and its significant cultural, natural, and scientific resources, with much needed protections.

22.     Under President Obama's Proclamation 9558, the Tribes have an integral role in developing management plans for the area, and UDB has been poised to provide important institutional and traditional knowledge to the Tribes and the federal government in the development of these plans.  That assistance includes the identification of cultural resources in the Bears Ears National Monument, development of programs for traditional use of ecological resources, and promoting sustainable practices based on cultural and historical use of the area. For instance, before the monument designation, UDB provided an exhaustive study to the federal government that analyzed collaborative management practices for protected areas. *See, e.g.*, Utah Diné Bikéyah, Collaborative Management of Protected Areas, with Examples of Collaboration between Native American Tribes and US Federal and State Agencies (Jan. 20, 2012), http://www.roundriver.org/wp-content/uploads/pubs/navajo/reports/Co-mgt-Backgrounder-Report-1-20-12.pdf.  This study exemplifies the type of organizational expertise UDB offers the Tribes as they help shape management plans.  UDB has also conducted an extensive literature

8

review report, developed a decision support tool that included all publicly available geographic information system ("GIS") data for the region, and commissioned a gap analysis to identify differences between the desires of the Navajo community and BLM management practices. With sufficient resources, UDB can bring these same skills to the Tribes and the National Monument's land management planning process.

23.     UDB will suffer direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of the Bears Ears National Monument.  As a result of President Trump's actions, UDB must now re-allocate its limited resources from these essential ethnographic and educational activities to costly, contentious activities to protect the objects and landscapes within the Bears Ears National Monument from resource development efforts, looting, vandalism, and other adverse impacts on the spiritual and aesthetic value of the area that result from President Trump's actions.  These new activities forced upon UDB include re-mobilizing community members to inform decision-makers about the valuable resources within the Bears Ears National Monument, drafting comments and engaging in efforts to restore the Bears Ears National Monument, and composing materials detailing the values and importance of the Bears Ears National Monument.

24.     UDB must also divert its limited resources from developing a sustainable economy built upon local artists, entrepreneurs, businesses, and community leaders in San Juan County, Utah.  As part of UDB's mission, UDB directs its resources toward establishing a local economy that supports the Tribes and their members in a manner that strengthens ties to the land, promotes native cultures and languages, and treats others with respect.  Because of President Trump's actions, however, UDB must divert those resources from significant opportunities tied to the existence of the National Monument and toward assistance to local businesses to protect

the area from mining, looting, and other adverse impacts. These are activities that would not be undertaken but for the Revocation Proclamation.

25.     The Bears Ears National Monument is home to sacred landscapes and many sacred sites and resources of significant cultural and spiritual value to the Tribes, and the protection of these landscapes is the central mission of UDB. The Navajo people, as well as members of other tribes, have used, and continue to use, the area for traditional medicine and herb gathering, pinyon gathering, and ceremonies.

26.     UDB and its members are committed to ensuring that the ancestral lands within the boundary of the Bears Ears National Monument remain protected so that the vital historic record of the native peoples and opportunities for modern, sustainable cultural use are preserved for future generations. The organization will now have to dedicate time, money, and effort to the campaign to protect these now-threatened areas, to support the Tribes in their individual and collective efforts to oversee the management of their ancestral lands, and to educate the public about why these particular lands are significant. Threats to the landscape of the National Monument are also threats to the cultural heritage and identity of the Tribes and their members.

27.     UDB members share deep personal ties to the Bears Ears National Monument, having lived their entire lives close to or within the boundaries described by Proclamation 9558. The areas protected by the Bears Ears National Monument are central to their culture, their faith, and their community. UDB members regularly visit the Bears Ears region to gather herbs and firewood, pray, conduct ceremonies, hike, camp, and explore the areas now protected by the Bears Ears National Monument. The Bears Ears National Monument, and the interconnected historical and cultural resources of its landscape, are of significant cultural and spiritual value to UDB members. Thus, President Trump's revocation of the designation of the landmarks,

structures, and objects and reduction of the National Monument's boundaries will allow for uses that have the potential to desecrate this sacred place of worship.

**Friends of Cedar Mesa**

28.     Friends of Cedar Mesa was founded in 2010 by a former BLM employee to foster stewardship and advocacy for the Cedar Mesa area, with a particular focus on protecting cultural resources. The organization's mission is to ensure that the federal public lands in San Juan County, Utah—with all their cultural, natural, and recreational value—receive appropriate protection and respect.  Friends of Cedar Mesa works to achieve its mission in four core areas: policy and advocacy; education and interpretation; stewardship and monitoring; and cultural resource research.  Friends of Cedar Mesa also works to create local, regional, and national support for greater protection of Cedar Mesa through education, advocacy for national designations, support for smart local policy-making, and organization of research and volunteer service activities.

29.     Friends of Cedar Mesa is a non-profit organization exempted from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of the State of Utah, and headquartered in Bluff, Utah. Friends of Cedar Mesa is also a member of CLF's Friends Grassroots Network, and, like CLF, has long been involved in stewardship and advocacy to protect the historical and natural aspects of the Bears Ears area.

30.     Friends of Cedar Mesa has a significant interest in the Bears Ears National Monument.  The greater Cedar Mesa area is located within the boundaries of the Bears Ears National Monument.  Over the past many years, Friends of Cedar Mesa has observed damage to cultural resources in the area caused by looting, inadequate signage or protective barriers, and careless visitors.  The damage to the cultural resources in this area resulted primarily from a lack

11

of resources necessary for conserving the area.

31.     Friends of Cedar Mesa was involved in, and committed substantial resources to, protecting the Bears Ears region. In 2013, Friends of Cedar Mesa began focusing its efforts on advocating for protection of Cedar Mesa as a conservation area or national monument as a means to secure additional funding and legal protections for the area. As part of this effort, Friends of Cedar Mesa worked with Utah Diné Bikéyah and Archaeology Southwest to advocate for national monument status and protection for the Bears Ears landscape.

32.     Friends of Cedar Mesa devoted significant resources to bringing awareness to and educating the public on the value of designating the Bears Ears region as a national monument. Friends of Cedar Mesa also undertook a landmark project to identify archaeological resources in this area. Friends of Cedar Mesa staff prepared a 300+ page report detailing the archaeological resources within the Bears Ears National Monument. This project required a significant commitment of staff time and resources, taking hundreds of hours to complete, and represented a culmination of the organization's on-the-ground knowledge of cultural resources within the Bears Ears region. For the summer of 2016, this project was the organization's single largest undertaking. Friends of Cedar Mesa staff and board members travelled to Washington, D.C. on multiple occasions to advocate for the permanent protection of the Bears Ears landscape. Friends of Cedar Mesa also created a 179-page report, including a detailed bibliography, entitled "A Cultural Landscape Overview of Archaeological Resources in the Bears Ears National Monument," with the assistance of professional archaeologists and Archaeology Southwest. Both of these reports were provided to the Department of the Interior, BLM, and Secretary Ryan Zinke prior to the Revocation Proclamation.

33.     Friends of Cedar Mesa will suffer direct and immediate injury from the revocation

of the designation of the landmarks, structures, and objects of the Bears Ears National Monument. As a result of the Trump Administration's attempt to revoke the national monument designation, Friends of Cedar Mesa will need to divert its limited resources from other preservation efforts to reactivating its activities to protect and restore the objects comprising the Bears Ears National Monument. Friends of Cedar Mesa had decided to campaign against development in the Bluff Bench and Montezuma Canyon areas by organizing public meetings, actions, and advocacy. But because of President Trump's unlawful decision, Friends of Cedar Mesa has redirected staff hours and financial resources away from this campaign to protect the Bears Ears National Monument and the objects constituting that monument. Additionally, Friends of Cedar Mesa set forth a plan to do work inside the National Monument educating visitors, monitoring archaeological sites, catching looters, and building trails and protective fences. Now that national monument status has been illegally revoked, Friends of Cedar Mesa will have to divert resources set aside for those activities to challenging President Trump's unlawful decision.

34.     President Trump's actions have also negatively impacted Friends of Cedar Mesa's ability to obtain grants and funding for conservation activities. For example, Friends of Cedar Mesa applied for funding from the Bears Ears National Monument Community Engagement Fund to perform work within the Bears Ears National Monument. This grant is only available, however, if the work is actually performed within a national monument.

35.     The board members of Friends of Cedar Mesa use and enjoy the areas designated as the Bears Ears National Monument for several activities, including hiking, rock climbing, rafting, backpacking, canyoneering, river running, photographing, and observing the area's unique archaeology, geology, paleontology, and habitat. The objects of historic and scientific

interest comprising the Bears Ears National Monument are critical to the use and enjoyment of

the National Monument by board members.  Many of the board members of Friends of Cedar

Mesa enjoy clean drinking water from the Navajo aquifer, which lies under land within the Bears

Ears National Monument and is thereby protected from the impacts of extractive activities.

**Archaeology Southwest**

36.     Since its inception, Archaeology Southwest's core mission has been to pursue

preservation archaeology in the southwestern United States – Arizona, New Mexico, Colorado,

and Utah.  Preservation archaeology is a holistic, conservation-based approach to exploring the

places of the past focused on preserving cultural landscapes, archaeological sites, artifact

collections, and archives.  Archaeology Southwest undertakes a broad range of preservation

initiatives on behalf of these resources.  For example, Archaeology Southwest conducts low-

impact research, educates the public on archaeological issues, and protects irreplaceable

archaeological sites through education, easements, and fee ownership.

37.     Archaeology Southwest is a 26 U.S.C. § 501(c)(3) nonprofit organization

headquartered in Tucson, Arizona.  Archaeology Southwest is also a member of CLF's Friends

Grassroots Network.

38.     Archaeology Southwest has a specific interest in supporting the designation of

landscapes like Bears Ears as national monuments to preserve the land and its resources. In fact,

in 2001, Archaeology Southwest published a special issue of its quarterly magazine that

highlighted the Antiquities Act and each of the new national monuments in the Southwest

designated by President Clinton.  As another example, since 2009, Archaeology Southwest has

advocated for the establishment of a Great Bend of the Gila National Monument in an 84,000-

acre area that follows the Gila River for roughly 80 miles southwest of Phoenix.

39. Archaeology Southwest was involved in, and committed substantial resources to, protecting the Bears Ears area. In 2014, Archaeology Southwest identified the protection of the Bears Ears area as a priority for the organization. As part of this initiative, Archaeology Southwest worked with Friends of Cedar Mesa to propose a national monument or conservation area.

40. Archaeology Southwest devoted significant resources to bringing awareness to and educating the public on the value of the Bears Ears area, including by devoting a double issue of Archaeology Southwest's quarterly magazine to the Bears Ears area. Archaeology Southwest also sent a letter to President Obama explaining the importance of this area. Archaeology Southwest staff visited Washington, D.C. to advocate for the permanent protection of Bears Ears. Additionally, Archaeology Southwest's Executive Director engaged with then-Secretary Jewell regarding the importance of designating the Bears Ears region a national monument.

41. Archaeology Southwest will suffer direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of the Bears Ears National Monument. As a result of the Trump Administration's efforts to revoke the national monument designation, Archaeology Southwest will need to divert its limited resources from other preservation efforts to continuing support of the Bears Ears National Monument. For example, Archaeology Southwest has organized a team to put together a second magazine issue highlighting the value and importance of the area. In addition, Archaeology Southwest worked with Friends of Cedar Mesa to organize and implement an August 23, 2017 gathering of professional archaeologists who are experts in the Bears Ears region to identify important archaeological resources, important research issues, and important protection priorities for Bears

Ears National Monument. To that end, Archaeology Southwest staff members have devoted extraordinary amounts of effort to planning, implementing, and preparing a public report on this expert gathering. Additional efforts will be necessary.

42.     But for President Trump's actions, Archaeology Southwest would focus its resources and quarterly magazine on other areas and projects. Archaeology Southwest has also diverted the time and effort of its staff as well as its financial resources to raising awareness for the Bear Ears National Monument – actions that would be unnecessary if its national monument designation had not been illegally revoked by President Trump. Because it is a small non-profit organization, the diversion of resources has a significant effect on Archaeology Southwest's ability to carry out its mission of preservation archaeology for other areas in need of protection.

**Patagonia Works**

43.     Patagonia Works ("Patagonia") is an outdoor apparel company with a 40-year history of environmental conservation and activism. Protecting and preserving the environment is a core business tenet as reflected in Patagonia's mission statement: "Build the best product, cause no unnecessary harm, use business to inspire and implement solutions to the environment crisis." The company's specific public benefit purposes of business, conservation and social equity are recognized and mandated by California law because Patagonia is a California benefit corporation. Cal. Corp. Code §§ 14600 *et seq. See* Patagonia Works, Restated Articles of Incorporation (filed with Ca. Sec'y of State, Oct. 10, 2013). Among other things, Patagonia is legally required to: (i) contribute one-percent (1%) of its annual net revenue to non-profit charitable organizations that promote environmental conservation and sustainability; (ii) create a material positive impact on society and the environment, and (iii) consider the impact of any

action on its workforce, customers and the environment.  Patagonia's corporate headquarters are located in Ventura, California.

44.    Consistent with its statutorily recognized specific public benefit purposes, Patagonia has donated more than $89 million to thousands of grassroots environmental groups, with more than $7 million in grants made in 2016 alone.  In addition to providing funding to these groups, Patagonia has invested substantial company resources to amplify their message, using its own marketing platforms and employee time to advocate for their shared conservation goals.  Patagonia has also provided tactical support for the groups it funds, including hosting a bi-annual "Tools for Grassroots Activists" conference, where it brings together environmental nonprofits with advocacy experts to train nonprofit employees on executing their mission.

45.    Many of the groups receiving Patagonia's support over the past forty years have worked to protect threatened wild places and other special public landscapes in their local communities, including through national monument designations.  These groups have galvanized local support for the designations that now ensure the protection of the following national monuments: (1) the Basin and Range National Monument in Nevada; (2) the Berryessa Snow Mountain National Monument in California; (3) the Castle Mountains National Monument in California; (4) the Mojave Trails National Monument in California; (5) the Sand to Snow National Monument in California; (6) Gold Butte National Monument in Nevada; and (7) Bears Ears National Monument in Utah.

46.    Patagonia has a long history in the Bears Ears area because it provides some of the best rock climbing in North America.  Patagonia's employees have visited Bears Ears numerous times for various purposes, including but not limited to, product testing, marketing, professional training, fitness, education, recreation, spiritual and aesthetic enjoyment, and other

purposes.  Bears Ears is used for similar purposes by Patagonia's customers and sponsored

athletes.  Patagonia's workforce and many of its customers intend to visit Bears Ears in the

future.

47.     In 2013, recognizing the Bears Ears area as one under threat from development

that would materially alter the landscape and irreparably harm the cultural objects inexorably

linked to the land, Patagonia became directly engaged in the effort to preserve and protect it.

Since that time, Patagonia has collaborated with and provided grants to groups supporting the

creation and preservation of a Bears Ears national monument.

48.     Patagonia also dedicated substantial resources to creating, and now preserving,

the national monument designation and educating the public on the unique and unrivaled natural

setting of the Bears Ears area, as well as the threats posed to natural and cultural resources the

area contains.  This effort included the production of the 2015 film "Defined by the Line," which

followed Josh Ewing of Friends of Cedar Mesa as he described the unique and threatened

features of the region and depicted oil and gas development threats, and the 2017 interactive film

allowing viewers to tour Bears Ears and experience the landscape that is preserved within the

monument to build awareness of and support for the monument.  Patagonia also advocated for

creating a national monument at Bears Ears through its marketing channels, including its

company website, on its social media platforms that have several million followers, and through

its catalogs and company blog.

49.     Patagonia's advocacy efforts supporting the protection of Bears Ears also include

organizing phone, social media and letter-writing campaigns, and meeting with state and federal

government officials, including staff at the U.S. Department of the Interior, BLM, and the White

House Council on Environmental Quality, as well as Utah's governor and congressional

representatives.  Patagonia's CEO, Rose Marcario, and the Outdoor Industry Alliance brought

together industry leaders and companies to present a unified industry position in support of Bears

Ears.  The company's founder, Yvon Chouinard, penned opinion pieces in the *Los Angeles Times*

and *Salt Lake Tribune* supporting Bears Ears' monument designation and the preservation of

public lands.  Patagonia has had to, and must now continue to, divert resources from ongoing and

future strategic priorities that have, and will continue to, impair Patagonia's ability to expand

upon its mission and its specific public benefit purposes as a benefit corporation.  Patagonia's

executives and many others have redirected their time and attention from other corporate goals

and priorities to the effort to preserve the Bears Ears National Monument.

      50.     Patagonia will suffer direct and immediate injury from the revocation of the

designation of the landmarks, structures, and objects of the Bears Ears National Monument.  By

virtue of its long history in the region, its statutory purposes and obligations as a California

benefit corporation that require Patagonia to use its business to conserve public lands like Bears

Ears, its substantial investment of financial support, and employee time, into the establishment

and defense of the Bears Ears National Monument, the revocation of the Bears Ears National

Monument and will cause Patagonia to suffer an immediate and irreparable injury.  As a result of

President Trump's actions, Patagonia will be forced to divert more resources away from other

organizational activities in support of conservation and social equity and towards protection and

restoration of the objects comprising the Bears Ears National Monument.

      51.     Patagonia's employees and sponsored athletes regularly visit the region to climb,

run, and explore areas now protected by the Bears Ears National Monument.  The objects of

historic and scientific interest comprising the Bears Ears National Monument are critical to the

use and enjoyment of Patagonia's employees and sponsored athletes.

**The Access Fund**

52.     The Access Fund ("Access Fund" or "AF") has a dual mission to create, protect, and enhance access to rock climbing areas nationwide, and to conserve the climbing environment.  To achieve its conservation mission, AF encourages and promotes environmental stewardship within the nation's rock climbing community and also engages in specific land management issues that threaten to affect the environmental quality of the nation's climbing areas.

53.     AF is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3) and an accredited land trust representing the interests of millions of climbers and mountaineers nationwide.  AF is headquartered in Boulder, Colorado.

54.     AF is the largest U.S. climbing advocacy organization with approximately 15,000 members and 100 local affiliates, including the Friends of Indian Creek, which was established to focus on stewardship projects within the Bears Ears National Monument.  AF provides climbing management expertise, stewardship, project-specific funding, and educational outreach.  Utah is one of AF's largest member-states.  AF members from the State of Utah and across the country regularly climb in the Bears Ears National Monument.

55.     For nearly twenty years, AF's policy program has engaged in land management issues within the State of Utah.  AF's efforts in Utah include participating as a leading stakeholder in the BLM Monticello Field Office's Indian Creek Corridor planning process, as well as advocating for climbing interests for three years during attempts to pass Utah Congressman Bishop's Public Lands Initiative.

56.     The Access Fund also employs six professional trail builders and conservation specialists ("AF Conservation Team") to help local climbing communities assess impacts and

climbing area conservation needs, address general conservation needs, and provide training on stewardship planning and best practices for keeping their climbing areas healthy. The AF Conservation Team has spearheaded and worked on numerous stewardship projects within the Bears Ears National Monument, resulting in camping and parking improvements, the installation of toilets, and the construction and maintenance of climbing access trails.

57.     AF staff dedicated hundreds of hours engaging with a wide range of stakeholders, including tribal interests, local government, the conservation community, and recreation groups to advocate for permanent protection for the Bears Ears region through national monument designation. This collaborative process resulted in the Bears Ears Inter-Tribal Coalition submitting a letter to the Secretary of the Interior endorsing the inclusion of climbing as a legitimate use of monument lands in the presidential proclamation. AF later submitted its own letter to the Secretary of the Interior formally endorsing the establishment of a Bears Ears National Monument and advocating for the inclusion of climbing as a legitimate use of monument lands in the presidential proclamation. Ultimately, for the first time in history, President Obama expressly mentioned rock climbing as one of the recreational opportunities to be protected through the establishment of the Bears Ears National Monument.

58.     AF members regularly visit the Bears Ears region to climb, hike, camp, canyoneer, and explore in the areas now protected by the Bears Ears National Monument. In addition to the beauty and solitude afforded by the Bears Ears region, AF members enjoy visiting and viewing the vast cultural resources contained in the Bears Ears region, which contribute significantly to their spiritual and aesthetic enjoyment of the area. Thus, the objects of historic and scientific interest comprising the Bears Ears National Monument are critical to AF members' use and enjoyment of the National Monument.

**The National Trust for Historic Preservation**

59.     Plaintiff the National Trust for Historic Preservation in the United States (the
"National Trust") is a private charitable, educational, non-profit corporation chartered by
Congress in 1949 to protect and defend America's historic resources, to further the historic
preservation policy of the United States, and to facilitate public participation in the preservation
of our nation's heritage. *See* 54 U.S.C. § 312102.

60.     The mission of the National Trust is to provide leadership, education, and
advocacy to save America's diverse historic places and revitalize our communities.  The statutory
powers of the National Trust include the power to bring suit in its corporate name. *Id.*
§ 312105(c).  Consistent with its congressional charter and its statutory powers, the National
Trust has participated in numerous actions to enforce federal laws that protect historic and
cultural resources, including actions to protect national monuments.

61.     The National Trust is headquartered in Washington, D.C., has a number of field
offices around the country and twenty-seven Historic Sites that are open to the public across the
United States.  The National Trust has more than one million members and supporters around the
country.

62.     For more than a decade, the National Trust has been intensively involved in and
has contributed substantial funding to protect cultural resources within Bears Ears and to support
the effort to designate the Bears Ears National Monument.  For example, the National Trust has
made grants totaling approximately $50,000.00 to support research projects in areas within Bears
Ears, including providing funding to BLM that was used for stabilizing Chacoan walls in Arch
Canyon.  The National Trust helped fund a publication called "*Cliff Dwellers of Cedar Mesa*"
intended to increase public awareness and understanding of the history of the Bears Ears area.

63.     The National Trust also commissioned additional research within the past decade, including Class I cultural resource surveys for Cedar Mesa, and the National Trust prepared a heritage and eco-tourism report. The National Trust has also provided technical assistance and support to grassroots groups, and has undertaken efforts to educate the public and policymakers about the history and significance of the Bears Ears National Monument and the threats to its preservation. In September 2014, the National Trust designated the area that later became Bears Ears National Monument as a National Treasure, and in September 2016 Bears Ears was named to the National Trust's annual list of "America's 11 Most Endangered Historic Places." These designations helped to build public awareness of the cultural resources at Bears Ears.

64.     Members of the National Trust regularly visit the Bears Ears region to hike, camp, and explore in the areas within the Bears Ears National Monument. The objects of historic and scientific interest within the Bears Ears National Monument are critical to the members' use and enjoyment of the monument.

**The Society of Vertebrate Paleontology**

65.     The Society of Vertebrate Paleontology ("SVP") is the world's largest paleontological organization. SVP's mission is four fold: (1) to promote and advance the science of vertebrate paleontology around the world; (2) to serve the common interest of and facilitate cooperation between all persons concerned with the history, evolution, ecology, comparative anatomy, and taxonomy of vertebrate animals, as well as the field occurrence, collection, and study of fossil vertebrates and the stratigraphy of the beds in which they are found; (3) to support and encourage the discovery, conservation, and preservation of vertebrate fossils and fossil sites; and (4) to foster scientific, educational, and personal appreciation and understanding of vertebrate fossils and fossil sites by its paleontologists and the general public.

66.     SVP is a non-profit organization exempt from taxation under 26 U.S.C.
§ 501(c)(3).  It is incorporated under the laws of California and headquartered in Bethesda,
Maryland.

67.     SVP's membership includes more than 2,200 scientists, students, artists, and other
individuals interested in the science of vertebrate paleontology across the United States and
abroad.

68.     Founded in 1940, SVP has been a leader in the paleontological community for
nearly eighty years.  It holds an annual scientific conference, publishes journals and a memoir
series of vertebrate paleontological research, engages in education and outreach, and participates
in activities relating to the preservation of scientifically important vertebrate paleontological
resources.

69.     SVP has been advocating for decades to conserve public lands as a means of
ensuring access to and protection of paleontological resources.  Beginning in 1991, SVP
successfully argued against bills in the United States Senate that would have permitted
commercial collecting on public lands, and SVP continued to work with Congress and executive
agencies to increase protections for vertebrate fossils.  In 2009, SVP was instrumental in passing
the Omnibus Public Land Management Act of 2009.

70.     SVP and its members have devoted substantial time and resources to the
protection of paleontological resources within the Bears Ears National Monument.  SVP
especially focused its advocacy efforts on explicit recognition of paleontology as a value to be
protected by the monument designation.  As the organization learned through its experience with
the designation of the Grand Staircase-Escalante National Monument, that recognition prompts
federal agencies to prioritize paleontological research over other uses of the land, and it enhances

funding opportunities for research through the National Landscape Conservation System.

71.     SVP members regularly visit the Bears Ears National Monument to conduct research on paleontological resources within the boundaries described by Proclamation 9558. SVP members have also published extensively on paleontological research within the area of the Bears Ears National Monument and have done so since at least 1965.  In collaboration with the BLM, SVP members have also participated in educational outreach activities about the paleontological research at the Bears Ears National Monument before and after its designation. The objects of historic and scientific interest within the Bears Ears National Monument are critical to the members' present and future research within the National Monument.

## II.     Defendants

72.     Defendant Donald Trump is the President of the United States.  In his official capacity, he signed and issued the Revocation Proclamation revoking and replacing the Bears Ears National Monument.  The President resides and conducts his duties in Washington, D,C,

73.     Defendant Ryan K. Zinke is the Secretary of the United States Department of the Interior.  In his official capacity, he is charged with ensuring that the Department of the Interior and its constituent agencies, including BLM, fulfill their duties.  These duties include management of the Bears Ears National Monument in accordance with the mandates of the Omnibus Public Land Management Act of 2009 and Proclamation 9558.  The Secretary of the Interior resides and conducts his duties in Washington, D.C.

74.     Defendant Sonny Perdue is the Secretary of the United States Department of Agriculture.  In his official capacity, he is charged with ensuring that the Department of Agriculture and its constituent agencies, including the U.S. Forest Service, fulfill their duties. These duties include management of areas within the Bears Ears National Monument in accordance with law and Proclamation 9558.  The Secretary of Agriculture resides and conducts

his duties in Washington, D.C.

75.     Defendant Brian Steed is the Deputy Director, Programs and Policy, of the

Bureau of Land Management.  In his official capacity, he exercises the authority of the Director

of the Bureau of Land Management and is charged with ensuring that BLM fulfills its duties.

These duties include management of the Bears Ears National Monument in accordance with the

mandates of the Omnibus Public Land Management Act of 2009 and Proclamation 9558.  Upon

information and belief, the Deputy Director, Programs and Policy, of the Bureau of Land

Management resides and conducts his duties in Washington, D.C.

76.     Defendant Tony Tooke is the Chief of the United States Forest Service.  In his

official capacity, he is charged with ensuring that the United States Forest Service fulfills its

duties.  These duties include the management of areas within the Bears Ears National Monument

in accordance with law and Proclamation 9558.  The Chief of the United States Forest Service

resides and conducts his duties in Washington, D.C.

## LEGAL FRAMEWORK

77.     The Property Clause of the United States Constitution states that "[t]he Congress

shall have Power to dispose of and make all needful Rules and Regulations respecting the

Territory or other Property belonging to the United States[.]"  U.S. Const. art. IV, § 3, cl. 2. The

United States Constitution thus grants Congress the exclusive authority for regulation of public

lands. Absent a congressional delegation under the Property Clause, the President lacks any

authority over public lands.

78.     The Take Care Clause of the United States Constitution states that the President

"shall take Care that the Laws be faithfully executed[.]"  U.S. Const. art. II, § 3, cl. 5.

79.     The Antiquities Act provides that "[t]he President may, in the President's

discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a).

80.     The Antiquities Act also states that "[t]he President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b).

81.     The Antiquities Act does not authorize the President to revoke the national monument status of landmarks, structures, and objects previously designated as such.

82.     The Antiquities Act does not authorize the President to modify the reservation of land for a national monument, *e.g.*, land use restrictions, in such a way as to deprive the landmarks, structures, and objects comprising the monument of proper care and management.

83.     The Antiquities Act does not authorize the President to modify the parcels of land reserved for a national monument in such a way as to make the reservation incompatible with the proper care and management of landmarks, structures, and objects comprising the monument.

84.     The Omnibus Public Land Management Act of 2009 provides that all lands within national monuments administered by BLM become part of the National Landscape Conservation System. 16 U.S.C. § 7202(b)(1)(A).

85.     The Omnibus Public Land Management Act of 2009 commands the Secretary of the Interior to manage all lands within the National Landscape Conservation System in accordance with any applicable law (including regulations) relating to any component of the system and in a manner that protects the values for which the components of the system were designated. *Id.* § 7202(c).

## FACTS

### I.     The Creation of the Bears Ears National Monument

86.     On December 28, 2016, President Barack Obama signed Proclamation 9558 establishing the Bears Ears National Monument.  82 Fed. Reg. at 1139.

87.     The Bears Ears National Monument, which is located in the southeastern corner of Utah, encompasses a wide variety of historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest situated on approximately 1.35 million acres of federal land.  This federal land includes parts of the Manti-La Sal National Forest managed by the United States Forest Service and other land managed by the Bureau of Land Management.

88.     The area that makes up the Bears Ears National Monument under Proclamation 9558 has played an integral part in the long history of the West.  As early as 13,000 years ago, mobile groups known as the Clovis people hunted along the cliffs and in the canyons of the area, leaving tools and projectiles behind.  82 Fed. Reg. at 1139.  Hunters and gatherers followed as far back as 8,500 years ago, succeeded by the Ancestral Puebloans 2,500 years ago.  Other peoples such as the Fremont, Numic- and Athabaskan-speaking hunter-gatherers, and the Ute, Navajo, and other Native peoples have used and relied on this area.  *Id.*

89.     The landscape reflects the marks of these peoples, with petroglyphs and pictographs dating back at least 5,000 years.  *Id.* And "[t]he area's cultural importance to Native American tribes continues to this day." *Id.* at 1140.

90.     Proclamation 9558 sets forth a wide variety of objects of historic and scientific interest as a result of the objects' cultural importance.  These objects include "[a]bundant rock art, ancient cliff dwellings, ceremonial sites, and countless other artifacts [that] provide an extraordinary archaeological and culture record[.]" *Id.* at 1139.  That record contains, among other items, tools, projectile points and other weapons, baskets, pottery, family dwellings,

granaries, kivas, towers, villages, roads, Moki steps carved into canyon walls, petroglyphs, pictographs, and Navajo hogans. *See id.* at 1139-40.

91.     These objects also include unique natural formations that Native American tribes have tied to their stories of creation, of danger, of protection, and of healing. *Id.* at 1140. And the ecological resources of the area provide medicinal and ceremonial plants, edible herbs, and crafts. *Id.* Moreover, Native American knowledge of those ecological resources itself provides a resource for managing the landscape on behalf of future generations. *Id.*

92.     Other objects of historic and scientific interest within the Monument played a central role in the Euro-American development of the West. *Id.* Observers of the Mormon faith traced their route through the area, "smooth[ing] sections of the rock surface and construct[ing] dugways and other features still visible along their route." *Id.* Not to be outdone, outlaws like Butch Cassidy and the Sundance Kid used a complex trail network "to avoid detection." *Id.*

93.     The National Monument also consists of objects that are landscape in scale and beyond the interaction of humans with the landscape: The area offers "stunning geology," extensive paleontological resources, and innumerable ecological resources. *Id.* at 1140-41. The landscape and geography includes cliffs, canyons, desert, mesas, mountains, meadows, forests, grasslands, rivers, ridges, rock formations, stone spires, hoodoos, and, naturally, the buttes that give the Bears Ears area its name. *Id.* at 1139-42.

94.     The designated objects of the Bears Ears National Monument also include habitat supporting plant life of scientific, cultural, and ecological significance, including many species or subspecies of trees, shrubs, yucca, cacti, grasses, and wildflowers. In particular, the area offers a wide diversity of soils and microenvironments that can support a breadth of flora and fauna. *Id.* at 1141-42.

29

95.     The National Monument protects habitat supporting animal life of scientific, cultural, and ecological significance, including mule deer, elk, bighorn sheep, foxes, bobcats, mountain lions, eagles, falcons, hawks, owls, and bats. *Id.* at 1142.

96.     Paleontological evidence of past landscapes and life are also preserved in Proclamation 9558. "The paleontological resources in the Bears Ears area are among the richest and most significant in the United States, and protection of this area will provide important opportunities for further archaeological and paleontological study." *Id.* at 1141. There are a wealth of fossil resources in the following areas of the National Monument: Arch Canyon, Comb Ridge, the Valley of the Gods, Indian Creek, and the Chinle, Wingate, Kayenta, and Navajo Formations. *Id.*

97.     The designation of the Bears Ears National Monument preserves critical values connected with these numerous, unique landmarks, structures, and objects of scientific, cultural, and ecological significance, and with culturally important and interconnected landscape across 1.35 million acres of federal land.  These values include at least:

a.      preservation and appreciation of an extraordinary archaeological and cultural record, *see* 82 Fed. Reg. at 1139;

b.      the landscape's sacredness to the Tribes and its continuing cultural importance to their members, *see id.*;

c.      preservation and appreciation of ancient artistry and architecture, *see id.*;

d.      opportunities to study the landscape's stunning geology, *id.* at 1140;

e.      preservation and appreciation of paleontological resources, *id.* at 1141;

f.      appreciation of the landscape's visual and auditory aesthetic value, *id.*;

g.      preservation of the landscape's ecological resources and systems, which provide

habitat, water-filtering, hunting, pasturing, and other goods, *see id.* at 1141-42;

h.      enjoyment of the landscape through outdoor recreation, *id.* at 1143;

i.      economic opportunity through travel and tourism, *id.*; and

j.      recognition of the importance of tribal participation in the care and management

of the objects identified in Proclamation 9558 and a commitment to ensuring that

management decisions affecting the Bears Ears National Monument reflect tribal

expertise and traditional and historical knowledge, *see id.* at 1144.

98.      To protect these values, Proclamation 9558 reserved lands from certain uses and

imposed certain conditions and directives in that reservation. *See id.* at 1143.

99.      Most notably, President Obama established a Bears Ears Commission composed

of one representative from each of the Navajo, Hopi, Zuni, Ute Indian, and Ute Mountain Ute

Tribes (the Tribes, as referenced above). *Id.* at 1144. The Secretaries of the Interior and

Agriculture must "meaningfully engage the Commission" or its successor entity in the

development of management plans for and management of the Bears Ears National Monument.

*Id.* The Secretaries must particularly "carefully and fully consider integrating the traditional and

historical knowledge and special expertise" of the Commission. *Id.*

100.      Proclamation 9558 established a boundary encompassing 1.35 million acres of

federal land and withdrew all federal lands within the Bears Ears National Monument from all

forms of entry, location, selection, sale, or other disposition under the public land laws, including

mining laws, or the laws applicable to the United States Forest Service. *Id.* at 1143.

101.      Proclamation 9558 also protected lands within Bears Ears National Monument

from oil and gas leasing and development. *Id.* at 1143. The Mineral Leasing Act of 1920,

which governs oil and gas leasing on federal land, excludes from mineral leasing land designated as a national monument. 30 U.S.C. § 181.  Applying this authority, Proclamation 9558 mandated that all federal public land within the National Monument was "appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws . . . and from disposition under all laws relating to mineral and geothermal leasing." 82 Fed. Reg. at 1143.  As a result, the proclamation protects the entirety of the over 1.35 million-acre designation and permanently withdraws it from future oil and gas leasing and development.

102.    Under Proclamation 9558, the Secretary of the Interior and the Secretary of Agriculture are responsible for the management of the Bears Ears National Monument through the Bureau of Land Management and the United States Forest Service, respectively.  *Id.*

103.    The Secretary of the Interior is responsible for managing those parts of the Bears Ears National Monument not contained within the boundaries of the National Forest System.  All such lands within the Secretary's responsibility are to be managed as part of the National Landscape Conservation System.  *Id.*

104.    Under Department of the Interior policy, all National Conservation Lands must be managed "to protect the values for which they were designated, including, where appropriate, prohibiting uses that are in conflict with those values."  Ken Salazar, Sec'y of the Interior, Order 3308: Management of the National Landscape Conservation System, ¶ 4a (2010).  The same policy directs that National Conservation Lands, including national monuments, "shall be managed as an integral part of the larger landscape[.]"  *Id.* ¶ 4b.

105.    Under BLM policy, the agency will take a variety of actions to incorporate the values of a national monument designation and implement the commands of the Omnibus Public

Land Management Act of 2009. *See* BLM Manual 6220: National Monuments, National

Conservation Areas, and Similar Designations, ¶ 1-1 (Jan. 25, 2017). These actions include:

a.　　managing national monuments to conserve, protect, and restore nationally

significant landscapes, *see id.* ¶ 1-6.A.1;

b.　　managing discretionary uses in a manner consistent with the protection of a

monument's values, including prohibiting such uses where necessary, *see id.* ¶ 1-

6.A.2;

c.　　inventorying and monitoring the objects and values for which a national

monument was designated, *see id.* ¶ 1-6.A.3;

d.　　managing valid existing rights and other non-discretionary uses in a manner that

mitigates, to the greatest extent possible, impacts to the objects and values for

which a monument was designated, *see id.* ¶ 1-6.A.4;

e.　　engaging the public on monument lands through education, interpretation,

partnerships, and volunteer and job opportunities, *see id.* ¶ 1.6.A-5;

f.　　fostering active volunteer programs for monuments to enhance a public sense of

stewardship and to accomplish high-priority work, *see id.* ¶ 1.6.A.6;

g.　　utilizing the best available science to manage monuments, *see id.* ¶ 1.6.A.7;

h.　　appointing a manager for each new monument who has decision-making and

supervisory authority and whose primary duty is to manage the monument, *see id.*

¶ 1.7.D.3;

i.　　clearly identifying objects and values described in the proclamation during land

use planning, and, where those objects and values are described in broad

categories, identifying the specific resources within the monument that fall into
those categories, *see id.* ¶ 1.12.G.4.a;

j.       developing and sustaining diverse partnerships dedicated to conserving,
         protecting, restoring, and interpreting national monuments, *see id.* ¶ 1.14.J.1;

k.       supporting formalized partnership agreements, such as Friends' Groups, for each
         monument, *see id.* ¶ 1.14.J.2;

l.       providing access for recreational opportunities within a national monument,
         where recreational values are identified in the proclamation, and conserving,
         protecting, and restoring those values, *see id.* ¶ 1.14.K.1;

m.       promoting national monuments as sites for scientific research, *see id.* ¶ 1.15.M.2;
         and

n.       developing and updating science plans for each monument, with particular
         attention to organizing scientific reports and compiling and synthesizing prior
         research, *see id.* ¶ 1.15.M.3.f.

106.     The Secretary of Agriculture is responsible for managing those parts of the Bears
Ears National Monument contained within the boundaries of the National Forest System.  All
such lands within the Secretary's responsibility are to be managed as part of the Manti-La Sal
National Forest.  82 Fed. Reg. at 1143.

107.     As part of their management responsibilities, the Secretary of the Interior and the
Secretary of Agriculture must, "to the maximum extent permitted by law and in consultation
with Indian tribes, ensure the protection of Indian sacred sites and traditional cultural properties
in the monument and provide access by members of Indian tribes for traditional cultural and
customary uses[.]" *Id.* at 1145.  These traditional uses include "collection of medicines, berries

34

and other vegetation, forest products, and firewood for personal noncommercial use in a manner consistent with the care and management of the objects" comprising the Monument. *Id.*

108.    The Secretaries must together prepare a transportation plan for the Bears Ears National Monument "[f]or the purposes of protecting and restoring" those same objects. *Id.* at 1145.  Under this plan, "motorized and non-motorized mechanized vehicle use shall be allowed only on roads and trails designated for such use, consistent with the care and management of such objects." *Id.* "Any additional roads or trails designated for motor vehicle use must be for the purposes of public safety or protection of such objects." *Id.*

109.    As described in Proclamation 9558, the Bears Ears National Monument contains objects of historic and scientific interest that are integral to our identity as a nation and should, accordingly, be protected for the public good consistent with the authority that the Antiquities Act grants the President to so designate these areas.

## II.    The Process Leading to Creation of the Bears Ears National Monument

110.    The recent designation of the Bears Ears National Monument through Proclamation 9558 is the product of years of public advocacy and engagement by Plaintiffs, tribal nations, and other groups with interests in protecting the cultural, historic, and ecological heritage of southeastern Utah.

111.    Members of Native American tribes with ties to the southeastern Utah area began organizing a proposal for protection of the Bears Ears area in 2010.  Bears Ears Inter-Tribal Coalition, *Proposal to President Barack Obama for the Creation of Bears Ears National Monument* 3 (2015), http://utahdinebikeyah.org/wp-content/documents/Bears-Ears-Inter-Tribal-Coalition-Proposal-10-15-15.pdf.

112.    In 2011, the President of the Navajo Nation sent a letter to then-Secretary of the Interior Ken Salazar proposing a new national monument protecting the Bears Ears area.  The

Navajo Nation is located in northwestern New Mexico, northern Arizona, and Southeastern Utah.

113.    By mid-2013, Utah Diné Bikéyah had conducted more than 70 interviews of Native elders and experts to understand traditional cultural uses in San Juan County, Utah.  UDB also carried out research from all seven Utah Chapter Houses (local government entities of the Navajo Nation), held dozens of community meetings on this issue, obtained tens of thousands of statements of support, developed GIS data of the area for its decision support tool, and held several gatherings of the Tribes at Bears Ears to discuss land protection strategies.

114.    In 2013, UDB and the Navajo Nation presented a proposal to the San Juan County Commission for a national conservation area to be jointly managed by Tribal Nations.  This proposal anticipated the enactment of a federal Public Lands Initiative program in which the County would play a role.  Congress never enacted the Public Lands Initiative, and the San Juan County Commission did not respond to the proposal.  In fact, the San Juan County Commission later advocated for the creation of an "energy zone" across a vast swathe of the Bears Ears area.

115.    In September 2014, the Hopi Tribe, located in Arizona, petitioned President Barack Obama and the Utah congressional delegation for designation of the Bears Ears region as a national conservation area or a national monument.  The Hopi Tribe emphasized the cultural importance of the Bears Ears region and explained the need for monument designation since the region's archaeological, natural, and geographic resources had been degraded by "looting, federal management inadequacies, industrial development," and "inappropriate all terrain vehicle use."

116.    On November 19, 2014, the All Pueblo Council of Governors, which represents the Pueblo tribes located largely in New Mexico, passed a resolution supporting the "permanent,

long-term protection of cultural resources and sacred sites on public land in the Greater Cedar
Mesa region through designation such as a National Conservation Area or a National
Monument."

117.    On February 9, 2015, the Hualapai Tribal Council of the Hualapai Tribe in
Arizona approved a resolution supporting the designation of the Bears Ears area as a National
Conservation Area or a National Monument.

118.    In March 2015, the Naabik' í yáti' Committee of the 23rd Navajo Nation Council
unanimously approved a resolution supporting UDB's proposal for federal designation of the
Bears Ears area as a national conservation area or a national monument.  The resolution
concluded that designation of the area as a national conservation area or national monument
"will provide important consistency and quality to management of these lands," especially
because "protection will be permanent, part of a national system of protected lands that carry
strong and clear legal definitions of the primacy of conservation of cultural, historical and
ecological values[.]"

119.    In April 2015, groups including CLF, Friends of Cedar Mesa, and UDB united
their ongoing efforts as a group of supporting organizations to advance and publicize proposals
for federal protection of the Bears Ears region.

120.    On July 14, 2015, the Tribal Business Committee of the Ute Indian Tribe, located
in northeastern Utah, resolved to support the permanent protection of the Bears Ears region.  The
Committee explained that "Native American traditional and cultural sites need protection from
outside threats such as mineral development, indiscriminate off-road vehicle use, and looting."

121.    Also in July 2015, the Assistant Secretary of Indian Affairs for the Department of
the Interior, the National Park Service Director, the Deputy Director of the Bureau of Land

Management, and the Deputy Under Secretary for Natural Resources and Environment for the Department of Agriculture attended the 2nd Bears Ears Inter-tribal Gathering.  There, the federal officials met with Tribal leaders and representatives from other stakeholders to discuss protection of the Bears Ears area.

122.    In October 2015, the Bears Ears Inter-Tribal Coalition released a formal proposal for the designation of the Bears Ears National Monument under the Antiquities Act.  This proposal called for a monument encompassing 1.9 million acres, based on the boundaries proposed in the Public Lands Initiative, to be jointly managed by a group of Tribes.

123.    On March 7, 2016, the Executive Directors of CLF and Friends of Cedar Mesa, along with their counterparts from five other conservation non-profits, wrote President Barack Obama to express their support for the proposal of the Bears Ears Inter-Tribal Coalition.  On the same day, the Zuni Tribal Council passed a resolution supporting "the permanent protection of the Bears Ears region and its cultural and natural resources through a national monument designation[.]"

124.    On March 25, 2016, the Hopi Tribal Council approved a resolution supporting "the long term protection of cultural and natural resources and sacred sites on these public lands through a proposal for a Presidential Proclamation designating Bears Ears National Monument."

125.    On June 9, 2016, members of the Utah Tribal Leaders Association passed a joint resolution calling for protection of the Bears Ears area as a national monument.

126.    In June 2016, Archaeology Southwest and Friends of Cedar Mesa issued an open letter to President Barack Obama, signed by several hundred professional archaeologists, calling for the protection of artifacts in the Bears Ears area through the Antiquities Act.  The archaeologists explained: "The Bears Ears cultural landscape is full of stunning and remarkably

well preserved cliff dwellings. Countless mesa-top pueblos, shrines and ancient roads attest to the tenacity of ancient inhabitants. Internationally important petroglyph and pictograph panels inspire visitors with the artistry of ancient storytellers. Undisturbed burials still cradle the ancestors of many regional Native American tribes. The preservation and density of these cultural resources rival and perhaps exceed those found within many nearby national parks and monuments. With more than 100,000 archaeological sites, the Bears Ears region is filled with exactly the kinds of 'objects' the 1906 Antiquities Act was created to protect." The archaeologists further explained that vandalism and removal of artifacts "continue at an alarming rate, with several dozen incidents in the last two years. Increasing visitation combined with a severe lack of resources for effective management and enforcement also create newer but no less menacing challenges to archaeology in the region."

127.    On July 16, 2016, then-Secretary of the Interior Sally Jewell, the Directors of the Bureau of Land Management and the National Park Service, the Under Secretary for Natural Resources and Environment for the Department of Agriculture, and other federal officials held a public meeting on community preferences for the federal lands at the Bluff Community Center in Bluff, Utah.  Over 1,500 citizens attended this meeting, with most of those who spoke supporting permanent protection for Bears Ears.  The majority of nearly 600 written comments also supported further federal protection.

128.    In October 2016, SVP members and other paleontologists sent a letter to President Obama explaining that the area holds some of the richest and most significant paleontological resources in the United States, many of which have yet to be scientifically examined.  These members urged the President to exercise his authority under the Antiquities Act to protect the known and as-yet-undiscovered paleontological resources from collection or destruction; the

members also sought designation to promote scientific research in the area.

129.    In November 2016, SVP sent a letter on behalf of the entire organization urging President Obama to protect the paleontological resources within the Bears Ears area. SVP specifically asked that the President recognize the value of promoting paleontological research, and, to that end, SVP provided draft language on the area's paleontological resources for use in a proclamation. Much of the information in Proclamation 9558 about the paleontological resources within the Bears Ears National Monument draws directly from this letter and the October 2016 letter from SVP members and other paleontologists, as well as from information provided in meetings between representatives of SVP and the Departments of the Interior and Agriculture.

130.    On November 30, 2016, Archaeology Southwest, Friends of Cedar Mesa, and sixteen other archaeological or historical preservation groups wrote President Obama to explain the need for national monument status to protect the Bears Ears area from "illegal looting, mismanaged recreational use, and inappropriate energy development."

131.    By the time of its creation, representatives from at least ten tribal government bodies, thirty local Utah officials, over 500 members of the scientific community, sixty-five national business leaders, 180 health professionals, sixteen religious leaders, and numerous non-profit organizations wrote federal officials to express their support for protection of the Bears Ears area.

### III.    President Trump's Attempt To Revoke the Bears Ears National Monument Executive Order 13,792

132.    The President has repeatedly attributed his decision to revoke the Bears Ears National Monument to requests from Senator Orrin Hatch. When the President signed Executive

Order 13,792, which commenced the review of existing national monuments this past spring, he stated he was signing the Order to "end another egregious abuse of federal power," and "this massive federal land grab . . . has gotten worse, and worse, and worse and now we're going to free it up." White House Office of the Press Secretary, *Remarks by President Trump at Signing of Executive Order on the Antiquities Act*, WhiteHouse.gov (Apr. 26, 2017), https://www.whitehouse.gov/the-press-office/2017/04/26/remarks-president-trump-signing-executive-order-antiquities-act. At the recent signing ceremony for the Revocation Proclamation, Senator Hatch stated that he approached President Trump in January 2017 with a request for aid in "fixing" the Bears Ears National Monument. *See President Trump Remarks in Utah*, C-SPAN.org (Dec. 4, 2017), https://www.c-span.org/video/?438061-1/president-trump-reverses-obama-administration-utah-monuments. The President agreed to "fix it" "without hesitation," according to Senator Hatch.

133.    On April 26, 2017, President Trump signed Executive Order 13,792, entitled "Review of Designations Under the Antiquities Act." 82 Fed. Reg. 20,429 (May 1, 2017).

134.    The Executive Order commands the Secretary of the Interior to review all presidential monument designations or expansions since January 1, 1996, where the designation covers more than 100,000 acres, where the monument after expansion covers more than 100,000 acres, or where the Secretary determines that the designation or expansion occurred without adequate public outreach. *Id.* Executive Order 13,792 does not explain the basis for the selection of 1996 or 100,000 acres as criteria for determining the monuments reviewed.

135.    The Executive Order required the Secretary of the Interior to assess issues outside the scope of the legal parameters of the Antiquities Act. For instance, the Executive Order instructs the Secretary of the Interior to review whether "designated lands are appropriately

classified under the [Antiquities] Act as 'historic landmarks, historic and prehistoric structures, [or] other objects of historic or scientific interest[.]'" *Id.* (first alteration in original) (quoting 54 U.S.C. § 320301(a)).

136.    The Executive Order directs the Secretary of the Interior to provide, within 45 days, an " interim report" on the findings of his review "with respect to Proclamation 9558 of December 28, 2016 (Establishment of the Bears Ears National Monument), and such other designations as the Secretary determines to be appropriate for inclusion in the interim report." *Id.* at 20,340. The interim report must include recommendations for executive, legislative, or other action with respect to Bears Ears National Monument and any other monument included.

137.    Executive Order 13,792 further directs the Secretary of the Interior to provide a "final report" to the President on his review of all designations and expansions. This final report must include recommendations for executive, legislative, or other action with respect to each monument. *Id.*

**Secretary Zinke's Interim Report**

138.    In response to Executive Order 13,792, the Department of the Interior issued a notice in the *Federal Register* inviting public comment for review by the Secretary. *See* Review of Certain National Monuments Established Since 1996, 82 Fed. Reg. 22,016, 22,016 (May 11, 2017). The notice identified twenty-seven National Monuments subject to the review, including the Bears Ears National Monument. *See id.* at 22,017.

139.    The Department of the Interior's notice did not solicit comments on the need to expand any existing national monument.

140.    For the twenty-six monuments besides Bears Ears, the notice set the deadline for comments at July 10, 2017. *See id.* at 22,016. But, for the Bears Ears National Monument, the

notice set the comment deadline at May 26, 2017, a mere fifteen days from its publication.  *See id.*

141.   UDB, Friends of Cedar Mesa, Archaeology Southwest, CLF, Patagonia, Access Fund, the National Trust, and SVP each submitted at least one comment letter in support of the designation as described in Proclamation 9558.

142.   UDB organized a comment-writing drive in which many of its members submitted comments to the Department of the Interior urging the continuation of the Bears Ears National Monument and each providing an explanation of the personal and cultural importance of the monument.  *See, e.g.*, Docket ID DOI-2017-0002-114138 (May 26, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-114138.  UDB also filed a separate comment letter requesting an extension of the comment period and explaining that government officials had made little-to-no effort to gather traditional knowledge of the Bears Ears area held by Native Americans that live in and around the land.  *See* Letter from Gavin Noyes, Executive Director, Utah Diné Bikéyah, Docket ID DOI-2017-0002-83535, at 1-2 (May 24, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-83535.  Without engaging these stakeholders, the Secretary of the Interior would lack "critical information that may be harmed if the boundary is shrunk."  *Id.* at 1.

143.   Friends of Cedar Mesa submitted a comment letter asking Secretary Zinke to retain the current boundaries and protections of the Bears Ears National Monument.  *See* Letter from Josh Ewing, Executive Director, Friends of Cedar Mesa, Docket ID No. DOI-2017-0002-81604 (May 24, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-81604.  That letter recounted the seven-year involvement of Friends of Cedar Mesa, and many other local community members, in the movement that eventually culminated with Proclamation 9558.  *See*

*id.* at 1-2.  Friends of Cedar Mesa also stressed the need for national monument status to protect

the 100,000 estimated archaeological and cultural sites in the Bears Ears area—more than any

other national park or national monument.  *Id.* at 2-3.  The vastness of these resources

necessitated the increased management attention, extra legal protections, inclusion of all

designated objects and lands reserved, and prevention of new extractive activities mandated by

Proclamation 9558.  *Id.* at 3-5.

144.    Archaeology Southwest submitted a resolution by its board of directors affirming

the obligation to maintain the Bears Ears National Monument.  *See* Resolution of Board of

Directors for Archaeology Southwest in opposition to any efforts to revoke or diminish Bears

Ears National Monument, Docket ID DOI-2017-0002-82235, at 1-2 (May 24, 2017),

https://www.regulations.gov/document?D=DOI-2017-0002-82235.  This resolution rebutted the

assumption behind Executive Order 13,792 that Proclamation 9558 did not follow a thorough

process of public discussion and stakeholder engagement.  *Id.* at 2.  Archaeology Southwest also

submitted a letter joined by six other non-profit organizations, including Friends of Cedar Mesa,

that urged Secretary Zinke to recognize the scientific, cultural, and economic value protected by

the boundaries of the Bears Ears National Monument.  *See* Letter from Archaeology Southwest,

*et al.*, Docket ID DOI-2017-0002-57625, at 1-2 (Mar. 3, 2017),

https://www.regulations.gov/document?D=DOI-2017-0002-57625.

145.    CLF submitted a comment letter explaining the years of local stakeholder

engagement that went into the designation of the Bears Ears National Monument.  *See* Letter

from Edward Norton, Chairman, Conservation Lands Foundation, Inc., Docket ID DOI-2017-

0002-90566, at 1-2, 3-4 (May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-

0002-90566.  CLF also detailed the extensive cultural, ecological, geological, paleontological,

and other resources that comprise the monument. *Id.* at 1-3. National monument designation is

necessary, CLF explained, to prevent extractive uses that will disrupt or destroy these resources,

prevent disposition of the land to non-federal entities, deter looting and vandalism, and generally

ensure long-term, landscape-level management planning. *Id.* at 2-3.

146. Patagonia submitted a comment letter explaining that, in sharp contrast to the

Secretary's review, "the process to establish a National Monument often takes years, if not

decades[,]" and that was exactly the case for Bears Ears National Monument. Letter from Yvon

Chouinard, Founder, Patagonia, Inc., and Rose Marcario, President & CEO, Patagonia, Inc.,

Docket ID DOI-2017-0002-133733, at 1 (May 4, 2017),

https://www.regulations.gov/document?D=DOI-2017-0002-133733. Patagonia also informed

the Department of the Interior of "the enormous economic benefits of protected public lands for

nearby communities," as demonstrated by recent empirical research and by job growth near the

Grand Staircase-Escalante National Monument. *Id.* at 3. "Rescinding or shrinking the National

Monuments under review[,]" including the Bears Ears National Monument, "would significantly

impact the strength of the outdoor recreation economy and limit [Patagonia's] ability to create

and sustain jobs." *Id.*

147. Access Fund submitted a comment letter explaining that "the process leading to

the Bears Ears National Monument designation adequately incorporated public outreach and

coordination with relevant stakeholders, and conforms to the requirements of the Antiquities Act

of 1906." Letter from Erik Murdock, Policy Director, Access Fund, Docket ID DOI-2017-0002-

94640, at 1 (May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-94640.

In particular, Access Fund explained that its "members from Utah and across the country

regularly climb in the Bears Ears National Monument because it is a world-class climbing area

with unique exceptional natural and cultural resource values[,]" and Access Fund provided a map of some of the canyoneering and rock climbing resources most important to its members. *Id.* at 2. Inadequate federal resources and attention, however, endanger these resources. *Id.* Access Fund therefore urged the Department of the Interior to maintain the existing Bears Ears National Monument because "a monument [land management] plan can bring long-overdue landscape-level management to an area threatened by over-use, resource extraction, and a chronic lack of management and agency resources needed to address multiple-use impacts." *Id.* at 3. Moreover, Access Fund explained the importance of maintaining Proclamation 9558's explicit recognition of rock climbing as a valued use and the impact of that recognition on the land management process. *Id.* at 3-4.

148. The National Trust submitted a comment letter opposing any reduction or rescission of "protections provided by the existing national monument designation." Letter from Stephanie K. Meeks, President and CEO, National Trust for Historic Preservation, Docket ID DOI-2017-0002-364407, at 1 (May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-364407. The National Trust recounted its history of working hand-in-hand with the Utah congressional delegation to promote conservation initiatives within the state, as well as the National Trust's efforts in support of the designation of the Bears Ears National Monument. *See id.* at 1-3. Furthermore, the National Trust explained that no reductions in the boundary of the monument could be compatible with the proper care and management of the objects designated by Proclamation 9558. *Id.* at 3. For instance, "archaeologists have overwhelmingly confirmed that there are highly significant prehistoric structures and objects throughout the [Bears Ears National] Monument, along with significant paleontological, geologic, and other scientific resources." *Id.* at 4. Resources are in fact so numerous, the National Trust explained, that

"[r]ather than being conceived of as a collection of individual or noncontiguous historic sites, the lands within Bears Ears are best treated as a collection of interrelated resources, and their historic significance is best understood in the context of the landscape and setting." *Id.*

149.    SVP submitted a comment letter defending the current boundaries of the Bears Ears National Monument and urging an expansion to protect more paleontological resources. *See* Letter from P. David Polly, President of SVP, *et al.*, Docket ID DOI-2017-0002-100908, at 1 (May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-100908.  SVP explained that it had provided significant input to the Department of the Interior on paleontological resources protected by the Bears Ears National Monument. *Id.* at 2.  SVP further identified the critical role of national monument status, and especially recognition of paleontology in Proclamation 9558, in promoting research and public understand of "scientifically invaluable" fossils within "[a]ll of the areas of Bears Ears[.]".  *Id.* at 2-3; *see also id.* at 10.  Along with a bibliography of supporting research, SVP explained the types and importance of fossils within each of area of the Bears Ears National Monument.  *Id.* at 3-5.

150.    An independent analysis of the comments submitted found the overwhelming majority support the designation of the Bears Ears National Monument as described in Proclamation 9558.  *See* A. Weiss, *Utah residents to Ryan Zinke: Hands off Bears Ears!*, (June 9, 2017), https://medium.com/westwise/utah-residents-to-ryan-zinke-hands-off-bears-ears-e2684046a3b4; *see also* A. Weiss, *New analysis shows national monument support dominates public comment period*, Medium.com (May 25, 2017), https://medium.com/westwise/new-analysis-shows-national-monument-support-dominates-public-comment-period-7550888175e.

151.    Before the close of the comment period for Bears Ears National Monument, Secretary Zinke visited the State of Utah to tour part of the Bears Ears area.  On May 8, 2017, he

met with representatives of Friends of Cedar Mesa, who provided him with extensive

information on the antiquities within the Bears Ears National Monument.  Friends of Cedar Mesa

also provided the Secretary with an extensive bibliography of archaeological and paleontological

research related to areas within the Monument.

152.    On the same day, SVP wrote to Secretary Zinke in order to bring his "attention to

the scientifically valuable fossil resources found at the Bears Ears National Monument as you

tour the area this week."  SVP encouraged him to visit Valley of the Gods, Cedar Mesa, Honaker

Trail, Red Canyon and similar formations, Indian Creek, and the Wingate, Kayenta, and Navajo

formations.  SVP also offered the services of local members to help inform his visit.  SVP did

not receive a formal reply to its invitation.

153.    On June 10, 2017, before the close of the public comment period for all other

monuments, Secretary Zinke issued an interim report on the Bears Ears National Monument.  *See*

Memorandum from Sec'y Ryan Zinke to President Donald Trump, "Interim Report Pursuant to

Executive Order 13792," DOI.gov at 1 (June 10, 2017)

https://www.doi.gov/sites/doi.gov/files/uploads/interim_report_eo_13792.pdf.  In just over one

page of analysis, the interim report concludes that the boundary of the Bears Ears National

Monument should be reduced.  *Id.* at 4-5.

154.    The interim report discusses only certain subsets of objects of historic or scientific

interest designated under Proclamation 9558 and ignores others.  The interim report names, for

instance, "archeological sites" as objects of historic or scientific interest, *see id.* at 1, but it

nowhere mentions paleontological sites, animal species, plant species, or their habitat.

155.    And even for the types of objects it does acknowledge, the interim report does not

explain where those objects can be found in the land reserved for the National Monument, which

areas of reserved land should be excluded from the National Monument, what changes, if any, have occurred to the objects designated under Proclamation 9558, or what impacts the removal of national monument status would have on those objects. The interim report offers no analysis or record in support of its conclusion, nor does it address any of the substantive comments provided as part of the truncated public comment period.

156.    On the same day that it released Secretary Zinke's interim report, the Department of the Interior issued a press release giving public notice that it would extend the comment period on the Bears Ears National Monument to July 10, 2017, despite the fact that Secretary Zinke had concluded in the interim report that the boundaries of the Bears Ears National Monument should be "modified." *See* Press Release, Dep't of the Interior, at 1 (June 10, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-153322.

**Secretary Zinke's Final Report**

157.    Friends of Cedar Mesa, Archaeology Southwest and Access Fund submitted supplemental comments in response to Secretary Zinke's interim report. These comments reiterated the need to protect the entirety of the landscape and resources within the Bears Ears National Monument.

158.    After the issuance of Secretary Zinke's interim report in June, SVP submitted an additional comment defending all non-marine national monuments. *See* Letter from P. David Polly, President of SVP, *et al.*, Docket ID DOI-2017-0002-655559, at 1 (July 9, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-655559. In this letter, SVP expanded on the need for national monument status, explaining that such status "allows protection of many sensitive paleontological sites and makes it easier for vertebrate paleontologists to conduct scientific research." *Id.* at 2. As SVP members had learned from the

designation of the Grand Staircase-Escalante National Monument, researchers can more readily

obtain permits for access to public lands, and, critically, a monument designation preserves "the

geological context" of fossil sites even after collection of the fossils. *Id.* at 3. The preservation

of this context allows later replication of studies essential to the scientific method. *Id.* And

thanks to their landscape-level scale, national monuments preserve this context across a wide

variety of locations and topographies, which allows study of a representative sample of past life

in the area. *Id.* In sum, "[n]ational monuments provide an almost ideal level of protection

because they are more accessible for research than the more heavily protected national parks and

are better protected than undesignated public lands." *Id.* Rescinding the Bears Ears National

Monument, SVP explained, would imperil fossil sites, their geological context, and the future

research related to both. *Id.* at 4.

159.    The government's website for the national monument review lists over 2.8 million

comments received. *See Review of Certain National Monuments Established Since 1996; Notice

of Opportunity for Comment*, Regulations.gov (last visited Dec. 6, 2017),

https://www.regulations.gov/document?D=DOI-2017-0002-0001.    Upon information and belief,

the vast majority of comments on the Bears Ears National Monument submitted through July 10,

2017, support the designation of the Monument as described in Proclamation 9558.

160.    On August 21, 2017, Friends of Cedar Mesa transmitted to the Department of the

Interior an exhaustive expert report compiling the current significant archaeological research of

the area comprising the Bears Ears National Monument, the subject of Proclamation 9558. This

report conclusively demonstrates that current research has identified significant archaeological

and cultural resources throughout each of ten sub-regions of the Bears Ears National Monument,

including areas excluded by the Revocation Proclamation. Upon information and belief, the

Department of the Interior had available to it the archaeological research comprising the foundation of the Friends of Cedar Mesa expert report at the time Secretary Zinke issued his interim report, but the Department of the Interior and Secretary Zinke did not address the findings contained therein. The Department of the Interior has not provided any substantive response to the content of the report.

161.    Upon information and belief, Secretary Zinke transmitted a "draft" final report to President Trump on or about August 24, 2017.  That draft report was not immediately made public by the Department of the Interior; instead, it issued a two-page document that purports to summarize Secretary Zinke's recommendations to the President.  *See generally* Report Summary by U.S. Secretary of the Interior Ryan Zinke, DOI.gov, https://www.doi.gov/sites/doi.gov/files/uploads/monument-report-summary.pdf.  This public summary gives no details about particular monuments but states that "monument status has a potential economic benefit of increased visitation, particularly to service related industries, outdoor recreation industries, and other businesses dependent on or supported by tourism."  *Id.* at 2.  The public summary also states that "[c]omments received were overwhelmingly in favor of maintaining existing monuments[.]"  *Id.*  Opponents of current monuments, the summary notes, were commonly associated with timber, mining, and motorized recreation industries.  *Id.*

162.    Upon information and belief, the Department of the Interior did not engage in government-to-government consultations with the Tribes on the content of the final report.

163.    The Department of the Interior made Secretary Zinke's final report public on December 5, 2017, one day after President Trump signed the Revocation Proclamation.  *See* Dep't of the Interior, *Secretary Zinke Recommends Keeping Federal Lands in Federal Ownership, Adding Three New Monuments*, DOI.gov (Dec. 5, 2017),

https://www.doi.gov/pressreleases/secretary-zinke-recommends-keeping-federal-lands-federal-ownership-adding-three-new.  The final report acknowledges that the Bears Ears National Monument contained "cultural and archaeological sites, unique geologic features, and areas important to the practicing of tribal cultural traditions and ceremonies[,]" as well as "areas . . . home to significant recreational opportunities, including hiking, backpacking, canyoneering, mountain biking, and rock climbing." *See* Memorandum from Sec'y Ryan K. Zinke to President Donald Trump, "Final Report Summarizing Findings of the Review of Designations Under the Antiquities Act," at 10 (Dec. 5, 2017), https://www.doi.gov/sites/doi.gov/files/uploads/revised_final_report.pdf.  But the report also expressly disparages the monument status of objects designated under Proclamation 9558, stating that the Bears Ears National Monument "contains many objects that are common or otherwise not of particular scientific or historic interest." *Id.*  The final report does not identify the areas of the monument where these objects could be found or describe other characteristics of these objects.

164.    The final report also rejects the designation of many of the types of objects under Proclamation 9558.  For example, without reference to facts or evidence, the report claims that "[a]dherence to the Act's definition of an 'object' . . . on some monuments was either arbitrary or likely politically motivated[.]" *Id.* at 2.  The final report also criticizes designation of "geographic areas, viewsheds, and ecosystems" as objects of historic or scientific interest, and the report suggests that objects should not be designated under the Antiquities Act if there other, similar objects that exist on separate parcels. *See id.*  The final report particularly criticizes the designation of landscapes as objects of historic or scientific interest, reserving an entire section for that stance. *See id.* at 7.  The final report does not refer to any legal precedent, such as an

updated analysis from the Office of Legal Counsel, U.S. Department of Justice, or prior case law, to support its stance on objects designated under Proclamation 9558.

165.    The final report appearing in press reports did not address with any specificity the comments submitted by Plaintiffs.

166.    On September 18, 2017, Archaeology Southwest submitted to the Department of the Interior a report based on publicly releasable information demonstrating how the more than 100,000 archaeological sites that are present within the Bears Ears National Monument represent a dynamic cultural landscape that conveys 13,000 years of human history. The Department of Interior provided no substantive response to this submission.

**The Revocation Proclamation**

167.    On December 4, 2017, President Trump signed the Revocation Proclamation. *See Presidential Proclamation Modifying the Bears Ears National Monument*, WhiteHouse.gov (Dec. 4, 2017), https://www.whitehouse.gov/the-press-office/2017/12/04/presidential-proclamation-modifying-bears-ears-national-monument.

168.    The Revocation Proclamation purports to "modify" the boundaries of the Bears Ears National Monument under Proclamation 9558, leaving two smaller "units" or "areas" to be known as Indian Creek and Shash Jáa. *Id.* Together, these putative units would encompass approximately 201,397 acres, thus removing protections from over 1.1 million acres included in Proclamation 9558 as well as landmarks, structures, and thousands of objects of scientific or historic interest contained on or within those lands. *Id.*

169.    The Revocation Proclamation purports to revoke the national monument status of those objects designated by Proclamation 9558 that "are not unique to the monument . . . . [or] are not of *significant* scientific or historic interest." *Id.* (emphasis added).  Instead, the

Revocation Proclamation protects only what it considers the "*important* objects of scientific or historic interest" designated as part of the Bears Ears National Monument under Proclamation 9558. *Id.* (emphasis added).

170.    The Revocation Proclamation further purports to "modify" the boundaries of the National Monument to be confined to the "smallest area compatible with the proper care and management" of only some, but not all, of the objects designated under Proclamation 9558. The Revocation Proclamation states, for instance, that "[s]ome of the existing monument's objects, or certain examples of those objects, are not within the monument's revised boundaries[.]" *Id.* Any lands not contained within the boundaries of the new units will be excluded from the protections of the Antiquities Act.

171.    The Revocation Proclamation erroneously asserts that the eliminated areas of the Monument will still be protected under other federal statutes, without any legal analysis as to how these laws provide equivalent, permanent protections akin to national monument status. *Id.*

172.    The Revocation Proclamation directs that, within 60 days after December 4, 2017, the excluded areas of the National Monument will be open to "entry, location, selection, sale, or other disposition under the public land laws[,]" "disposition under the laws relating to mineral and geothermal leasing," and "location, entry, and patent under the mining laws." *Id.* This directive does not specify how the Bureau of Land Management and the U.S. Forest Service are to implement this directive.

173.    The Revocation Proclamation also purports to change the conditions or directives of the land reservation effected under Proclamation 9558. *Id.*

a.      First, the Revocation Proclamation removes the requirement for BLM and USFS to consult the Bears Ears Commission on land management decisions for any

areas not contained within the purported Shash Jáa unit. *Id.*

b.      Second, the Revocation Proclamation adds an additional seat on the Bears Ears Commission for the elected officer of the San Juan County Commission representing District 3, in that officer's official capacity. *Id.*

c.      Third, the Revocation Proclamation authorizes the Secretaries of the Interior and Agriculture to permit motorized and non-mechanized vehicle use on roads and trails designated for such use prior to Proclamation 9558. *Id.*

d.      Fourth, the Revocation Proclamation authorizes the Secretaries of the Interior and Agriculture to permit road and trail maintenance. *Id.*

e.      Fifth, the Revocation Proclamation removes any effect of Proclamation 9558 on livestock grazing. *Id.*

f.      Sixth, the Revocation Proclamation authorizes the Secretaries of the Interior and Agriculture to permit active vegetation management activities in the National Monument. Upon information and belief, these activities can include the use of prescribed burning, wildfire, mechanical equipment, herbicides, or other techniques to destroy or remove naturally occurring vegetation. *Id.*

**Impacts of the Revocation Proclamation**

174.    Upon information and belief, Plaintiffs and their members, directors, officers, employees, or sponsored athletes will suffer direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of the Bears Ears National Monument, including the following objects:

a.      tens of thousands of historic and pre-historic structures, cliff dwellings, rock art panels (pictographs and petroglyphs), kivas, open service sites, pueblos, towers,

middens, artifacts, ancient roads, historic trails, and other archaeological

resources generally located in the vicinity of:

    i.      Cedar Mesa, including Grand Gulch;

    ii.     Valley of the Gods;

    iii.    Tank Mesa, Cottonwood Wash, and the Bluff Bench;

    iv.    Bowdie Canyon, Fable Valley, Ruin Park and the Beef Basin area;

    v.     the Dark Canyon complex;

    vi.    the Abajo Mountains and drainages of Allen, Dark, and Chippean

          Canyons;

    vii.   White Canyon and its many drainages;

    viii.  Mossback Mesa, Red House Cliffs, and Tables of the Sun;

    ix.    the Mancos Mesa and Moqui Canyon;

    x.     the San Juan River corridor, including the Sand Island petroglyph panels;

    xi.    Harts Draw and Lockhart Basin; and

    xii.   the entirety of the Grand Gulch Archaeological District, which is listed on

          the National Register of Historic Places;

b.     numerous paleontological resources in the vicinity of:

    i.      Indian Head Pass;

    ii.     Beef Basin;

    iii.    House Park Butte;

    iv.    Cathedral Butte;

    v.     Jacobs Chair;

    vi.    the Lockhart Basin;

    vii.        Indian Creek;

    viii.       Allen Canyon;

    ix.        White Canyon;

    x.        Fry Canyon;

    xi.        Valley of the Gods; and

    xii.       Red Canyon;

c.      numerous recreational objects and sites, including:

    i.        44 of 120 climbing cliffs (which are discrete and documented rock climbing sites that include one or more established climbing routes that ascend a rock outcrop), as well as all 22 named summits in the Valley of the Gods and hundreds of routes in Harts Draw and Lockhart Basin;

    ii.       undocumented or yet-to-be-climbed climbing cliffs;

    iii.      world-class canyoneering routes in White Canyon, Gravel Canyon, Cheesebox Canyon, Hideout Canyon, Fry Canyon, and other drainages of White Canyon;

    iv.       mountain biking trails;

    v.        whitewater paddling river segments;

    vi.       equestrian trails; and

    vii.       hiking and backpacking trails, in particular the iconic Fable Valley trail and the Dark Canyon trail system, and trails to historic mining and cowboy sites in or around Beef Basin, the Abajos Mountains, and Indian Creek;

d.      numerous geological and ecological objects of cultural, scenic, and scientific

interest, including at least:

i.        Native American hunting and wood- and herb-gathering grounds in the

vicinity of Cedar Mesa, Elk Ridge, and the Abajo Mountains;

ii.        the White Canyon complexes;

iii.        towers and sandstone structures in Chimney Park, Hammond Canyon,

Dark Canyon, and Lockhart Basin, and especially those in the Valley of

the Gods considered spiritually important to the Navajo Nation;

iv.        distinctive arches and natural bridges in many canyons, including

Wetherill Arch, Neville's Arch, Polly's Canyon Arch, Bowdie Canyon

Window, Causeway Arch, Cliff Dweller's Pasture Arch, and Fable Valley

Jug Handle Arch; and

v.        distinctive, endemic subspecies, including mammals, in the Abajo

Mountains.

175.    Upon information and belief, approximately 73% of documented archaeological

sites are found in areas to be removed from the National Monument.  (Documented sites are

distinct from known sites and existing sites, many of which are unknown to science or

management.)  For example, the following archaeological sites are excised by the Revocation

Proclamation: Two Kiva House, Eight Room Pueblo, Baby Mummy Cave, Baby Mummy Great

Road, Bannister Ruin, Battle Panel, BB Ruin, Beam Ruin, Bernheimer Alcove, Best Forgotten

Kiva, Big Man Panel, Big Panel, Bird's Nest (also known as Dry Wash Ruin), Cap Rock Ruin,

Castle Ruin, Ceiling House, Citadel, Clay Hills Kiva, Collins Cowboy Camp, Cottonwood Falls

Great House, Cow Tank, Cradleboard Site, Crawl on Your Belly, Cut-in-Two Cave, Dancing

through Time, Dark Horse (also known as Cliff Village), Decker Road, Digging Sticks, Double

Decker Ruin, Et Al Great House, Fable Fortress, Fable Valley Pueblo, Fallen Roof Ruin, Farm

House, Flat House, Fortified Mesa, Goat-on-a-Bicycle, Goldbar Panel, Gotta Wear Shades,

Granary Row, Green House, Green Mask Site, Grocery Store, Halfway House, Hammond Good

House, Harts Horse Panel, High House, large portions of the Hole-in-the-Rock Trail, Horse

Panel, Horse Rock Ruin, Jailhouse Ruin, Junction Ruin, Kiva Cave, Knob Ruins, L Pueblo,

Ledge Ruin, Lion Track, Little Doll House, Long House, M080 Observatory, Many Hands,

Marcia's Stonehenge, Moss Back Rock Art, Mountain Sheep & the Flute Player, Owen's Great

House, Owl Kiva, Painted Kiva, Pappy's Pasture, Pass Rock Art Site, Perfect Kiva (Bullet),

Perfect Kiva (Slickhorn), Picket Fork, Polly's Island, Polychrome House, Pottery Shine, Rattler

Cave, Red and White House, Red Knobbs, Red Lines Panel, Redman, Roof Ruin, Ruin Canyon

Tower, Sacred Mesa, Sagsteters Ruin, Sand Dune Site, Sand Island Lower Petroglyph Panel,

Sand Island Upper Petroglyph Panel, Scotty's Kiva, Seven Kivas, Shield Cave Ruin,

Showstopper, Split Boulder Archaic Panel, Split-Level Ruin, Swallows Nest, Tabernacle Ruin,

Tank Mesa Great Road, Telluride Blanket Site, the Hideaway, the Hunting Panel, the Playhouse,

the Rincon, Three Fingers, Three Moons Kiva, Tower Ruin, Turkey Pen, Turner's Cabin

(historic), Water House, Wetherill Arch Site, Witchy Woman, Wooden Kiva, Wrong-Side Ruin,

and Yellow House.

176.    The Revocation Proclamation opens areas previously protected by the Bears Ears

National Monument to activities in otherwise pristine and undeveloped areas.  Upon information

and belief, such incompatible uses will result in the destruction and degradation of irreplaceable

cultural, historic, and scientific resources from surface disturbance, ecosystem impacts, and

waste disposal, among other adverse impacts.  While these activities may be subject to certain

environmental and wildlife statutes, those statutes will only require procedural reviews,

mitigation and minimization of adverse impacts, and penalties once damage is done, as opposed

to monument status which ensures avoidance of all harm.  These impacts will threaten current

and ongoing use and enjoyment of the objects and land constituting the Bears Ears National

Monument, and thus will result in direct injury to the cultural, aesthetic, recreational, spiritual,

and scientific interests of the Plaintiffs and to those of the:

    a.      officers and board members of Conservation Lands Foundation;

    b.      members of CLF's Friends Grassroots Network organizations;

    c.      members of Utah Diné Bikéyah;

    d.      board members of Friends of Cedar Mesa;

    e.      employees of and athletes sponsored by Patagonia;

    f.      members of Access Fund;

    g.      members of the National Trust; and

    h.      members of the Society of Vertebrate Paleontology.

177.    In particular, and as a result of President Trump's actions, archaeological and

paleontological objects of scientific or historic interest designated as part of the Bears Ears

National Monument will receive less legal protection.  Upon information and belief, the reduced

legal protections will increase looting, vandalism, collection, and "pot hunting" of these

archaeological and paleontological objects.  Several cases of looting of paleontological sites have

been documented over the years. For instance, unknown parties removed the skull of a phytosaur

skeleton discovered in Fry Canyon in 2016.  Disturbance or removal of such objects directly

reduces the scientific, recreational, aesthetic, cultural, and spiritual value of the area to Plaintiffs

and their or similar affiliates.

178.    Upon information and belief, the Revocation Proclamation will also increase

threats to archaeological, paleontological, and other objects by reducing enforcement resources.
Currently, there are only one or two rangers patrolling and monitoring the area. Upon
information and belief, monument status for all objects and lands protected or reserved under
Proclamation 9558 will increase funding available for the management of the Bears Ears
National Monument, which will allow for the hiring of more personnel for monitoring and law
enforcement. Thus, the Revocation Proclamation will reduce the amount of funding available to
manage the excluded 1.1 million acres, which will reduce the availability of law enforcement
personnel, and increase the likelihood that objects within the National Monument will be looted
or vandalized.

179.    As a result of President Trump's actions, much of the land reserved as part of the
Bears Ears National Monument will be open to oil-and-gas leasing.  Before Proclamation 9558,
areas of the Monument were designated for oil and gas development under the 2016 Moab
Master Leasing Plan and the 2008 Monticello Resource Management Plan.   Industry has pushed
for new drilling sites in many areas of the National Monument.  For instance, oil-and-gas
developers had already submitted expressions of interest for more than 105,187 acres in or near
Bears Ears National Monument since 2013, including 88 requested parcels clustered in and
around the northeastern part of the Bears Ears National Monument near Indian Creek. *See*
Center for Biological Diversity, *Analysis of Oil and Gas Industry Interests* and *Mining Potential
on Federal Public Lands within Bears Ears National Monument*, (Aug. 19, 2017),
https://www.documentcloud.org/documents/3985752-Bears-Ears-Oil-Gas-and-Hard-Rock-
Mining-Analysis.html; *see also* Brian Maffly, "Oil and Gas Industry Will Pounce if Bears Ears
Shrinks," *Salt Lake Tribune* (June 19, 2017)
http://archive.sltrib.com/article.php?id=5351997&itype=CMSID.  The Indian Creek area of the

Bears Ears National Monument is widely recognize as a world-class rock climbing area for its sandstone crack climbing.  Members or similar affiliates of Plaintiffs' organizations regularly travel to Indian Creek to ascend its cliffs and admire the landscape.

180.    The oil-and-gas development allowed by the Revocation Proclamation within the Bears Ears National Monument will harm Plaintiffs and their members or similar affiliates. First, Plaintiffs or their members or similar affiliates must answer efforts by BLM and developers to lease land in Bears Ears National Monument through formal protests to BLM and informal advocacy.  Second, oil-and-gas leasing threatens the pristine landscapes of the Bears Ears National Monument.  Exploration and development will impair the aesthetic value of the National Monument to Plaintiffs and their members or similar affiliates.  Road construction, increased heavy vehicle usage, traffic, drilling, and other energy development activities will corrode the undeveloped areas of the Bears Ears National Monument.  Likewise, exploration and development will disturb the soundscape and viewscape in the National Monument.  Third, increased private development will diminish the climbing experience for, and recreational value to, Plaintiffs and their members or similar affiliates.

181.    As a result of President Trump's actions, and by the very terms of the Revocation Proclamation, areas previously within the boundary of the Bears Ears National Monument will be open to location, entry, and patenting for mining of uranium and other minerals.  *See* 30 U.S.C. § 22 (Mining Law of 1872).

182.    "Casual use" collection of minerals can immediately begin without any notification to BLM.  43 C.F.R. § 3809.10(a); *see also id.* § 3809.5(1)-(2) (defining "casual use").  More intensive "notice-level" operations may begin within 15 days of submitting notice to BLM.  *See id.* § 3809.21(a); *see also id.* § 3809.10(b).

183.    The increased exploratory and extractive activities within the boundary of the Bears Ears National Monument will destroy or harm objects of significant scientific or historic interest, including archaeological, paleontological, cultural, and ecological objects.  Furthermore, increased mineral development will degrade the scientific, recreational, aesthetic, cultural, and spiritual value of the area through disturbance of the surface soil and ecology, increased noise, harmful impacts to viewsheds, the creation of safety and other conflicts resulting from an increase in industrial traffic and infrastructure development at areas of high aesthetic value and popular recreational use.

184.    As a result of President Trump's action, areas within the National Monument's boundary will be open to "casual collection" of common invertebrate and plant paleontological objects designated as part of the Bears Ears National Monument.  36 C.F.R. § 291.12; *see also id.* § 291.5 (defining "casual collecting").  Casual collection can occur immediately as no permit from the United States Forest Service is required.  *Id.* § 291.11(a).  Disturbance or removal of paleontological objects will directly degrade the National Monument's scientific, recreational, aesthetic, cultural, and spiritual value.

185.    Upon information and belief, President Trump's actions will impede paleontological research on the 1.1 million acres excluded from national monument status.  First, as those lands will no longer be covered by a proclamation explicitly recognizing the value of paleontology, other uses might receive higher priority in agency planning decisions, with the result that paleontological research permits become more difficult to secure.  Second, even if fossils avoid collection or destruction, other uses within the National Monument can harm the geological context critical to scientific replication and understanding.  Third, the entirety of the National Monument will no longer be eligible for funding through the National Landscape

Conservation System; for other monuments like Grand Staircase-Escalante, the majority of public funding for paleontology originated with the National Landscape Conservation System. Loss of paleontological research opportunities, and the appreciation for paleontological objects that research provides, directly injures Plaintiffs and their members or similar affiliates.

186.    Upon information and belief, President Trump's actions will impede rock climbing and other recreational activities on the 1.1 million acres excluded from national monument status.  As those lands will no longer be covered by a proclamation explicitly recognizing the value of rock climbing and other recreational activities, other uses might receive higher priority in agency planning decisions, with the result that access to or other support for these activities becomes more difficult to secure.  Loss of or reduction in these activities directly injures Plaintiffs and their members or similar affiliates.

187.    As a result of President Trump's actions, areas within the boundary of the Bears Ears National Monument will no longer be managed in a manner that protects the values specified by Proclamation 9558 or be eligible for funding through the National Landscape Conservation System.  Moreover, the benefits of Secretarial Order 3308 and BLM Manual 6220 will no longer extend to the 1.1 million acres deprived of national monument status.  The loss of these benefits will impair Plaintiffs' organizational interests, as well as the cultural, aesthetic, recreational, or scientific interests of their members or similar affiliates.

188.    In particular, excluded lands will no longer be subject to BLM policies to inventory and monitor cultural resources, which in turn result in the development of cultural resource management plans.  Completing these plans requires additional cultural resource surveys.  Conducting detailed cultural resource surveys in the Bears Ears area is especially important because currently no more than 10 percent of the area has been surveyed for cultural

resources, notwithstanding the extraordinary significance of historic resources in the area.  Upon

information and belief, monument status for all objects and lands protected or reserved under

Proclamation 9558 will increase funding available for the management of the lands within Bears

Ears, including surveys to identify, evaluate, and protect cultural resources. Thus, the Revocation

Proclamation will reduce the amount of funding available for these activities and will impair

Plaintiffs' organizational interests, as well as the cultural, aesthetic, recreational, or scientific

interests of their members or similar affiliates.

## COUNT I – VIOLATION OF THE ANTIQUITIES ACT
### 54 U.S.C. § 320301(a)
### [All Plaintiffs against All Defendants]

189.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1

through Paragraph 188.

190.    Plaintiffs have a non-statutory right of action to injunctive and declaratory relief

against *ultra vires* actions by Defendants.

191.    Section 320301(a) of Title 54 of the United States Code provides that the

"President may, in the President's discretion, declare by public proclamation historic landmarks,

historic and prehistoric structures, and other objects of historic or scientific interest that are

situated on land owned or controlled by the Federal Government to be national monuments."

192.    The Revocation Proclamation revokes the national monument status of numerous

historic landmarks, historic and prehistoric structures, and other objects of historic or scientific

interest designated by Proclamation 9558.

193.    Upon information and belief, Defendants other than President Trump are

complying with the directives of the Revocation Proclamation and not implementing, and have

not implemented, those of Proclamation 9558.

194.    Neither § 320301(a) nor any other section of the Antiquities Act authorizes the President to revoke the national monument status of, or the protections for, objects designated under Proclamation 9558, as determined under the discretion of the establishing President. Congress has not delegated to the President the power to revoke the designation of "historic landmarks, historic and prehistoric structures, and other objects of scientific or historic interest" once they have been lawfully proclaimed national monuments.  Such power remains reserved for Congress under Article IV, Section 3, Clause 2 of the U.S. Constitution.

195.    The Antiquities Act does not authorize the Revocation Proclamation's action to revoke the designation of landmarks, structures, and objects comprising the Bears Ears National Monument.

196.    Defendants' attempt to revoke the designation of landmarks, structures, and objects comprising the Bears Ears National Monuments is an *ultra vires* action: The Revocation Proclamation exceeds the limited authority to declare national monuments Congress provided to the Executive under the Antiquities Act.

## COUNT II – VIOLATION OF THE ANTIQUITIES ACT
### 54 U.S.C. § 320301(b)
### [All Plaintiffs against All Defendants]

197.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 196.

198.    Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against *ultra vires* actions by Defendants.

199.    Section 320301(b) of Title 54 of the United States Code provides that the "President may reserve parcels of land as a part of the national monuments. The limits of the

parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."

200.    The Revocation Proclamation purports to "modify" the reservation of parcels of land that were made a part of the Bears Ears National Monument.  This action excludes from the National Monument's reservation a land area of approximately 1.1 million acres.

201.    By excluding vast land areas from the reservation made pursuant to Proclamation 9558, the Revocation Proclamation excludes from the National Monument reservation the landmarks, structures, and objects on those land areas that had been lawfully designated under Proclamation 9558.

202.    As a result, the Revocation Proclamation purports to remove these objects from the protection against entry, location, patent, selection, sale, or other disposition, among other protections established by Proclamation 9558.  The Revocation Proclamation directs Defendants other than President Trump not to provide such protection to approximately 1.1 million acres of land.  Upon information and belief, Defendants are complying with the directives of the Revocation Proclamation and are not implementing, and have not implemented, those of Proclamation 9558.

203.    The two "units" comprising the reservation under the Revocation Proclamation are not sufficient for, and thus not compatible with, the proper care and management of the objects designated as part of the National Monument by Proclamation 9558.

204.    The Revocation Proclamation also purports to eliminate beneficial conditions and directives of the reservation established by Proclamation 9558 even for the two new "units."  The Revocation Proclamation changes the scope of consultation with and composition of the Bears Ears Commission, allows motorized and non-mechanized vehicle use on roads and trails

67

designated for such use prior to Proclamation 9558, allows maintenance of roads and trails for such use, and allows active vegetation management activities.

205.    The elimination of the reservation conditions and directives established by Proclamation 9558 is not compatible with the proper care and management of the objects designated as part of the National Monument by Proclamation 9558.

206.    Neither section 320301(b) nor any other section of the Antiquities Act authorizes the President to "modify" the reservation directives of land or reduce the parcels of land reserved as part of the Bears Ears National Monument in a manner that precludes the proper care and management of the objects protected by Proclamation 9558.  Such power remains reserved for Congress under Article IV, Section 3, Clause 2 of the U.S. Constitution.

207.    The Antiquities Act does not authorize the Revocation Proclamation's actions to exclude vast areas of land from the National Monument's reservation or to eliminate beneficial conditions of that reservation.

208.    Defendants' attempt to alter the reservation of the Bears Ears National Monuments is an *ultra vires* action: The Revocation Proclamation exceeds the limited authority to declare national monuments and reserve the requisite land area that Congress delegated to the Executive under the Antiquities Act.

## COUNT III – VIOLATION OF THE SEPARATION OF POWERS
### U.S. Const. art. IV, § 3, cl. 2
### [All Plaintiffs against All Defendants]

209.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 208.

210.    The Constitution vests the power to dispose of and regulate the property of the United States solely in Congress.  Specifically, the Property Clause provides that "[t]he Congress

shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2.

211.    The Antiquities Act only empowers the President to declare national monuments and does not delegate authority to the President to revoke, abolish, diminish, or replace them.  54 U.S.C. § 320301.

212.    Defendants, through the Revocation Proclamation, purport to dispose of and regulate federal property, namely, the landmarks, structures, and objects of historic or scientific interest that comprise the Bears Ears National Monument and the land reserved for that monument, without a delegation of such power from Congress.

213.    Defendants, through the Revocation Proclamation, have arrogated to themselves Congress' exclusive power to dispose of and regulate the property of the United States.

## COUNT IV – VIOLATION OF THE TAKE CARE CLAUSE
### U.S. Const. art. II, § 3, cl. 5.
### [All Plaintiffs against President Trump]

214.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 213.

215.    The Constitution obligates the President and his agents to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3, cl. 5.

216.    Defendants Secretary Zinke and Deputy Director Steed have statutory duties to manage parts of the Bears Ears National Monument within the National Landscape Conservation System in a manner that protects the values for which the National Monument was designated. 16 U.S.C. § 7202(c)(2).

217.   President Trump has acted to compel Secretary Zinke and Deputy Director Steed to violate their duties to manage the entirety of the Bears Ears National Monument in a manner consistent with the values of President Obama's Proclamation 9558.

218.   Specifically, the Revocation Proclamation directs Defendants other than President Trump to cease managing all objects and lands excluded from the National Monument in a manner that promotes, and is consistent with, the values of Proclamation 9558.

219.   Additionally, the Revocation Proclamation directs Defendants other than President Trump to cease managing all objects and lands within the two new "units" in a manner that promotes, and is consistent with, the values of Proclamation 9558.

220.   By compelling other Defendants to violate their legal duties, President Trump has violated his own constitutional duty to take care that the laws of the United States are faithfully executed.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that this Court:

(a) DECLARE

    i.   that the Revocation Proclamation is unlawful and an *ultra vires* action to the extent that it purports to revoke the Bears Ears National Monument;

    ii.   that, pursuant to the Antiquities Act, the President may not unilaterally revoke the designation of landmarks, structures, or objects, and may not substantially alter the reservation of land, which together comprise a lawfully created national monument;

    iii.   that the President's power under the Antiquities Act is limited to:

     A.   declaring historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments, and

     B.   reserving, as part of a national monument, the smallest parcels of land compatible with the proper care and management of the objects to be protected;

iv.   that Proclamation 9558 is controlling with respect to the objects comprising, the parcels of land reserved as, and the management of the Bears Ears National Monument;

v.   that all Defendants other than President Donald J. Trump have duties to manage the Bears Ears National Monument to the fullest extent described in, in the manner provided for by, and in a manner that protects the values of Proclamation 9558; must withdraw lands within the Bears Ears National Monument, as described in Proclamation 9558, from all forms of entry, location, selection, sale, or other disposition under the public land laws or laws applicable to the United States Forest Service, from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral and geothermal leasing; and must not exchange any lands within the Bears Ears National Monument, as described in Proclamation 9558, other than by exchange that furthers the protective purposes of the Monument.

(b) ORDER Defendants other than President Donald J. Trump to expeditiously comply with all mandates of Proclamation 9558;

(c) ENJOIN Defendants other than President Donald J. Trump from further actions or inaction inconsistent with Proclamation 9558;

(d) AWARD qualifying Plaintiffs fees and costs as appropriate under 28 U.S.C. § 2412 or other applicable authority; and

(e) GRANT Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:  December 6, 2017

Respectfully submitted,

James T. Banks (DC Bar # 261156)
Adam M. Kushner (DC Bar # 426344)
Douglas P. Wheeler III (DC Bar # 463959)
J. Houston Shaner (DC Bar # 1032493)
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: 202-637-5600
Fax: 202-637-5910
Email: james.banks@hoganlovells.com
Email: adam.kushner@hoganlovells.com
Email: douglas.wheeler@hoganlovells.com
Email: houston.shaner@hoganlovells.com

*Attorneys for Utah Diné Bikéyah, Friends of Cedar Mesa, Archaeology Southwest, Conservation Lands Foundation, Inc., Patagonia Works, The Access Fund, the National Trust for Historic Preservation, and the Society of Vertebrate Paleontology*