IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HOPI TRIBE, *et al.*,

       Plaintiffs,

v.                                      Case No. 1:17-cv-02590 (TSC)

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al*.,

       Defendants.
_____

UTAH DINEBIKEYAH, *et al*.,

       Plaintiffs,

v.                                        Case No. 1:17-cv-02605 (TSC)

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al*.,

       Defendants.
_____

NATURAL RESOURCES DEFENSE
COUNCIL, *et al*.,

       Plaintiffs,

v.                                      Case No. 1:17-cv-02606 (TSC)

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al*.,

       Defendants.                  **CONSOLIDATED CASES**
_____

***AMICUS CURIAE* BRIEF OF CONSERVATIVES FOR RESPONSIBLE STEWARDSHIP
IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS'
MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ 2

I.    STATEMENT ............................................................................................................... 4

II.   ARGUMENT ................................................................................................................ 6

    A. Canons of Statutory Construction Discredit President Trump's Exercise of Delegated
       Legislative Power to Mutilate Bears Ears National Monument ........................................ 6

       1. Plain meaning doctrine ......................................................................................... 6

       B. Constitutional Avoidance......................................................................................... 8

       C. Counterarguments ................................................................................................... 9

III.  CONCLUSION............................................................................................................ 15

**TABLE OF AUTHORITIES**

## Cases

Page

*Albertson v. F.C.C.,*
  182 F. 2d 397 (D.C. Cir. 1950) ............................................................................... 12

*Consumer Product Safety Commission v. GTE Sylvania, Inc.,*
  447 U.S. 102 (1980) ............................................................................................... 14

*Industrial Union Dept. v. American Petroleum Institute,*
  448 U.S. 607, 448 U.S. 646 (1980)......................................................................... 9

*J.W. Hampton Jr. & Co. v. United States,*
  276 U.S. 394 (1928) ............................................................................................... 8

*Mistretta v. United States,*
  488 U.S. 361 (1989) ............................................................................................... 9

National Cable Television Assn. v. United States,
  415 U.S. 336, 415 U.S. 342 (1974) ......................................................................... 9

*NLRB v. SW Gen., Inc.,*
  ___ U.S. _____, 137 S.Ct.  929, 197 L. Ed. 2d 263 (2017) ....................................... 9

*Pierce v. Underwood,*
  487 U.S. 552 (1988) ............................................................................................... 14

*Public Citizen v. Department of Justice*,
    491 U.S. 440 (1989) ........................................................................................ 7

*Sierra Club v. Antwerp*,
    560 F. Supp. 2d 21 (D.D.C. 2008) ................................................................. 13

*Southern Pacific v. Jensen*,
    244 U.S. 205 (1917) ...................................................................................... 13

*U.S. ex rel. Attorney General v. Delaware & Hudson Co.*,
    213 U.S. 366 (1909) ........................................................................................ 8

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ...................................................................................... 15

*United States v. Price*,
    361 U.S. 304 (1960) ...................................................................................... 14

*United States v. Vonn*,
    535 U.S. 55 (2001) .......................................................................................... 9

## Statutes

30 Stat. 11, Act of Congress of June 4, 1897 ......................................................... 7

5 U.S.C.A. § 551(5) ............................................................................................... 13

16 U.S.C.A. §81a ..................................................................................................... 7

43 U.S.C.A. § 1701(a)(4) ...................................................................................... 14

54 U.S.C.A. § 320301 ............................................................................................. 6

54 U.S.C.A. § 320301(a) ........................................................................................ 4

54 U.S.C.A. § 320301(b) ........................................................................................ 4

54 U.S.C.A. § 320301(d) ...................................................................................... 11

U.S. Constitution, Article IV, Section 3, Clause 2 ............................................. 6, 8

## Rules

Rule 60 of the Federal Rules of Civil Procedure ................................................. 12

## Regulations

82 Fed. Reg. 58081 - 85 ..................................................................................... 6, 10

## Other Authorities

90 Cong. Rec. 9807-08 (1944)............................................................................... 11, 12

H.R. 2241 ............................................................................................................... 11

H.R. Rep. No. 94-1163 .......................................................................................... 14

Presidential Proclamation 9558 of December 28, 2016.................................... 4, 6, 9, 10

Presidential Proclamation 9681 of December 4, 2017.................................... 5, 9, 10, 13

Pub. L. No. 71-510................................................................................................... 7

S. Rep. No. 81-1938............................................................................................... 12

Alexandra M. Wyatt, Congressional Research Service, *Antiquities Act: Scope of Authority for Modification of National Monuments*, 7 (November 14, 2016)............................................... 11

## I.   STATEMENT

Exercising delegated legislative power under the Antiquities Act of 1906, 54 U.S.C.A. § 320301(a), President Barack Obama proclaimed southeastern Utah's Bears Ears National Monument on December 28, 2016, via Proclamation 9558 of December 28, 2016 ("Proclamation 9558").  See also Establishment of the Bears Ears National Monument, 82 FR 1139.  In extensive and vivid detail,  Proclamation 9558 elaborated a multiplicity of objects of historic or scientific interest worthy of protection by the national monument designation.  82 F.R. 1139-1143.  Among other things, Proclamation 9558 declared: "Protection of the Bears Ears area will preserve its cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources, ensuring that the prehistoric, historic, and scientific values of this area remain for the benefit of all Americans."  *Id.* at 1142-1143.

Acting pursuant to 54 U.S.C.A. § 320301(b), the President again exercised delegated legislative power to reserve approximately 1.35 million acres of land in furtherance of Proclamation 9558's creation of Bears Ears National Monument.  President Obama specifically

found that the reserved lands were "the smallest area compatible with the proper care and management of the objects to be protected." 82 F.R. at 1143.

No lawsuits challenged the legality of Bears Ears National Monument. Neither did Congress enact a statute nor pass a nonbinding resolution to narrow the monument's boundaries. Congressional acquiescence did not stem from inattention or from partisanship. The 2016 elections yielded a Republican controlled Congress and a Republican controlled White House. The Government's Memorandum in Support of Federal Defendants' Motion to Dismiss relates (Mem. 8), that the Bears Ears National Monument awakened strong political opposition, including many in the congressional delegations of the states affected.

This statement is untrue. The entirely Republican Utah delegation, whose state was most affected by the Bears Ears Proclamation, did nothing politically to oppose it. None introduced an opposing bill or resolution. None organized a congressional hearing questioning the Proclamation. Indeed, in their capacities as Members of Congress, the Utah delegation acquiesced in President Obama's establishment of Bears Ears National Monument by declining to wield any legislative power to change or override it.

Approximately one year after Bears Ears National Monument was established, Republican President Donald J. Trump purported to exercise delegated legislative power under the Antiquities Act to mutilate the National Monument through Proclamation 9681 of December 4, 2017, 82 Fed. Reg. 58081 ("President Trump's Proclamation"). President Trump's Proclamation shrunk the Monument's size by eighty-five percent (85%), akin to reducing the Taj Mahal to a handful of bricks. See Exhibit 1. President Trump's Proclamation argued that President Obama erred in identifying historic or scientific objects worthy of protection, and thus the Proclamation reserved lands beyond the smallest area compatible with the proper care and management of properly

protected objects.  82 Fed. Reg. 58084 - 58085.  President Trump did not dispute that Proclamation

9558 satisfied the smallest area mandate on the assumption that objects of historic or scientific

value had been correctly designated.

This lawsuit ensued.  *Amicus Curiae* Conservatives for Responsible Stewardship submits

this Brief in Support of Plaintiffs' Opposition to Federal Defendants' Motion to Dismiss limited

to the question of the non-existence of President Trump's delegated legislative authority under

the Antiquities Act to mutilate Bears Ears National Monument in Proclamation 9558.

## II.  <u>ARGUMENT</u>

### A.  CANONS OF STATUTORY CONSTRUCTION DISCREDIT PRESIDENT TRUMP'S EXERCISE OF DELEGATED LEGISLATIVE POWER TO MUTILATE BEARS EARS NATONAL MONUMENT

#### 1.  **Plain meaning doctrine**.

In pertinent part, the Antiquities Act (54 U.S.C.A. § 320301) provides:

> "(a) Presidential declaration—The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest situated on land owned or controlled by the Federal Government to be national monuments.
>
> (b) Reservation of land—The President may reserve parcels of land as part of the national monuments.  The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."

The plain meaning of the statutory text is that Congress has delegated legislative power

under the Property Clause of the Constitution, Article IV, section 3, clause 2, to the President to

proclaim national monuments to protect objects of historic or scientific value; and, to reserve lands

to the smallest area compatible with their proper care and management.  The text does not confer

delegated legislative power to the President to do the opposite, i.e., to revoke national monuments

or to diminish reserved lands in any material respect.  Congress knows what statutory language to

employ to make such a delegation. Thus, the Act of Congress of June 4, 1897 provides, in pertinent part:

> The President is hereby authorized at any time to modify any Executive Order that has been or may hereafter be made establishing any forest reserve, and by such modification may reduce the area or change the boundary lines of such reserve or may vacate altogether any order creating such reserve. 30 Stat. 11, 36.

Congress was equally explicit in delegating legislative power to alter national monument boundaries in creating the Colonial National Monument in Virginia. It provided that the boundaries "may be enlarged or diminished by subsequent proclamations of the President upon the recommendation of the Secretary of the Interior." Act of July 3, 1930, Pub. L. No. 71-510, 46 Stat. 855, 16 U.S.C.A. §81a. One searches in vain for any corresponding language in the Antiquities Act. The omission of the power to diminish was not inadvertent. That Congress has shown itself fully capable of unequivocally delegating legislative power to alter, revoke, dismember or mutilate reserved lands is indisputable. In these matters, Congress does not speak with an oracular or Delphic tongue.

In sum, plain meaning of the Act does not delegate legislative power to the President to revoke, dismember or mutilate national monuments. The plain meaning is dispositive of statutory interpretation unless the result would be absurd, freakish, or clearly contrary to congressional purpose. See, e.g., *Public Citizen v. Department of Justice*, 491 U.S. 440, 454 (1989). None of those exceptions apply.

The plain meaning does not lead to absurd results. A presidential proclamation creating a national monument—an exercise of delegated legislative power--is indistinguishable from direct congressional creation of a national monument by statute. In the latter case, the monument can be abolished or altered only by a superseding statute. It is not absurd to confer on national monuments

created by presidential proclamation the same permanency absent congressional action. Neither is that result odd or freakish.  Indeed, stable land boundaries are the norm, not the exception, in a government of laws, not of men. The Government's interpretation of the Act would make national monument boundaries contract and expand like an accordion depending on the political agenda of the incumbent president.  It would wreak havoc in the settled expectations of monument communities, an implausible result.

The plain meaning interpretation does not conflict with the Act's clear congressional purpose, i.e., to protect objects of historic or scientific value from plunder or exploitation.  It advances that objective by giving permanency to national monuments and their boundaries absent contrary congressional action.  Confining reserved land to the smallest area compatible with the proper care and managements of the objects to be protected is not an end in and of itself.  It is a means to an end, i.e., protecting objects of historic or scientific value.

## 2.    Constitutional Avoidance.

"[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."  *U.S. ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408 (1909).  If the Antiquities Act were interpreted to authorize the President to mutilate Bears Ears or other national monuments, it would present a grave constitutional question of whether legislative power had been unconstitutionally delegated to the President without any intelligible congressional standard for its exercise.

The Property Clause of the U.S. Constitution, Article IV, Section 3, Clause 2, authorizes Congress "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  The Antiquities Act constitutes a delegation of legislative power to establish national monuments.  Accordingly, the Act must provide intelligible

standards for the exercise of the delegated power. *J.W. Hampton Jr. & Co. v. United States,* 276 U.S. 394, 406-07 (1928).

While the Antiquities Act provides intelligible standards for the creation of national monuments, there is no language to inform any putative power to revoke or mutilate them.  To avoid a serious question about an unconstitutional Antiquities Act delegation, it should be interpreted against presidential power to revoke or mutilate a national monument as President Trump did to Bears Ears. The Supreme Court elaborated in *Mistretta v. United States,* 488 U.S. 361, 373 n. 7 (1989):

> In recent years, our application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional. *See, e.g., Industrial Union Dept. v. American Petroleum Institute,* 448 U.S. 607, 448 U.S. 646 (1980); *National Cable Television Assn. v. United States,* 415 U.S. 336, 415 U.S. 342 (1974).

The Government's position is in derogation of the well-worn tenet of statutory interpretation: *expressio unius est exclusio alterius.* The express reference to the President's power to "declare" contained in the Antiquities Act serves as a rejection of the implied negative of that power: to abolish or "undeclare" thereunder. *NLRB v. SW Gen., Inc.*, ___ U.S. _____, 137 S.Ct. 929, 940, 197 L. Ed. 2d 263 (2017) (Finding that while the negative implication of a statute is a context-specific exercise, the exercise becomes an unnecessary one when the statute's meaning, as here with the power to declare, is otherwise plain). *See United States v. Vonn*, 535 U.S. 55, 65 (2001).

### 3.  Counterarguments.

President Trump's Proclamation mutilating Bears Ears declares: "Some of the objects Proclamation 9558 identifies are not unique to the monuments, and some of the particular examples of these objects within the monuments are not of significant scientific or historic

interest." 82 Fed. Reg. 58081. But the Act does not require that protected objects be "unique," or mandate that their historic or scientific interest be "significant" - a highly subjective term that can be tortured to promote a political agenda.  President Trump's "uniqueness" and "significant" unilateral additions to the text of the Antiquities Act are unconstitutional.  Only Congress can amend statutory language.

President Trump's Proclamation also maintains that "many of the objects Proclamation 9558 identifies were not under threat of damage or destruction before designation such that they required a reservation of land to protect them." *Id*.  But the Act does not condition national monument proclamations and the reservation of lands on presidential findings that objects of historic or scientific interest be threatened with damage or destruction.  Again, President Trump's addition of language to the Act is unconstitutional.

President Trump's Proclamation further insists that the smallest area mandate in reserving lands for national monuments requires consideration of every statute or agency regulation that might then or later bear on the presidential calculation. 82 Fed. Reg. at 58081-58082.  But that gloss on the statutory text was manufactured by President Trump.  It is not found in the statute. And the gloss would make national monument boundaries expand or contract like an accordion in response to statutory or regulatory changes separate from the Antiquities Act—a very odd or startling result.

President Trump's Proclamation asserts that "many of the objects identified by Proclamation 9558 are otherwise protected by Federal law."  *Id*. at 58085. But the Act does not forbid more than one layer of protection for objects of historic or scientific value.  And the Proclamation does not declare that the Bears Ears National Monument boundaries established by President Obama conflict with any other federal statute or regulation.

The Government unconvincingly argues that it would be "nonsensical" to interpret the 'smallest area" directive of subsection (b) to prevent a President from second-guessing a predecessor. Mem. 30. Indeed, the Government urges that President Trump would have been flouting the law if he had declined to shrivel the boundaries of Bears Ears to what he believed was necessary to satisfy the smallest area mandate. *Id.* But that mandate is to be enforced through private litigation or congressional oversight, including statutory changes to national monument boundaries.  It is not an empty letter simply because the President is denied power to overturn boundary decisions of predecessors. A Congressional Research Service Report amplifies:

> "Congress also has power to revoke national monument proclamations by statute and has done so on occasion. In some instances of abolishment of national monuments, the land in question has been transferred to states.  Congress has also expanded or reduced the acreage of some national monuments…Congress has authority under Article I to spend money and section 9 of Article I prohibits expenditure of money without an appropriation.  Appropriation bills could prohibit funding for the enforcement of monument proclamations or particular usage provisions in a national monument management plan.  For instance, funding for Jackson Hole National Monument was limited for several years until Congress abolished the monument and made it Grant Teton National Park."  Alexandra M. Wyatt, Congressional Research Service, *Antiquities Act: Scope of Authority for Modification of National Monuments,* 7 (2016) ) (footnotes omitted.)

Fixing the boundaries of national monuments at their inceptions makes sense.  Stable boundaries protect the expectation or planning interests of monument communities.   These interests should not depend on the outcome of presidential elections.

The jousting between the President and Congress over the Jackson Hole National Monument illustrates how the Constitution's separation of powers contemplates the resolution of Antiquities Act disputes between the two branches.  President Franklin Roosevelt proclaimed the monument in 1936.  Proclamation No. 2193 of August 10, 1936.  Congress enacted legislation in 1944 that would have abolished the monument. H.R. 2241, 78th Cong. (1943); 90 Cong. Rec. 9196 (1944); 90 Cong. Rec. 9082-95, 9182-96, 9769 (1944). The bill was pocket vetoed by President

Roosevelt. 78th Cong., 2nd Sess., 90 Cong. Rec. 9807-08 (1944).   Congress answered by refusing to appropriate funds for the management of Jackson Hole for the remainder of the decade. S. Rep. No. 81-1938, at 4 (1950). The interbranch conflict terminated in 1950 with a compromise. Congress revoked the monument but added its lands to the Grand Teton National Park.  Congress additionally amended the Antiquities Act to prohibit any new presidentially proclaimed national monuments in Wyoming.  54 U.S.C.A. § 320301(d).

Contrary to the Government (Mem. 30), a presidential power to do an act does not, *ipso facto*, confer a power to undo the act either in whole or in part. The Constitution empowers the President to sign a bill presented by Congress, but the signing power does not confer a presidential power to undo the result of the signature.  The Constitution empowers the President to appoint federal judges with the advice and consent of the Senate, but that appointment power does not confer in the President a power to remove some or all federal judges at the president's whim.  The Constitution empowers the President to issue pardons, but that power does not confer a power to revoke them. Congress empowered the President to complete the Washington Monument by the Act of August 2, 1876, chap. 250.  To interpret that power to complete to include a presidential power to destroy or mutilate that venerated obelisk would be Orwellian.

Twin cases referenced by the Government (Mem. 30) are not to the contrary.  In *Albertson v. F.C.C.,* 182 F. 2d 397 (D.C. Cir. 1950), a congressional statute authorized the Federal Communications Commission to "rehear" its adjudicatory decisions.  An intervenor petitioned the Commission to reconsider a denial of a rehearing application.  The court of appeals held that administrative agencies acting in an adjudicatory capacity possessed inherent power to reconsider final judgments in the same manner as federal courts may re-open final judgments under Rule 60 of the Federal Rules of Civil Procedure.

President Trump's Proclamation, however, was not an administrative adjudication.  And it traveled far beyond procedure to undo or mutilate President Obama's substantive decision to create Bears Ears National Monument.  It is one thing to find presidential authority under the Antiquities Act make interstitial, molar, or molecular adjustments to a national monument.  It is quite another to find presidential power to destroy the torso leaving but a few limbs as relics of what had been.  Cf. *Southern Pacific v. Jensen*, 244 U.S. 205, 221 (1917) (Holmes, J. dissenting).   The Government's reliance on *Sierra Club v. Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008) is no more persuasive.  That case simply echoed the settled doctrine that administrative agencies possess inherent power to reconsider adjudicatory decisions, including a Clean Water Act permit issued by the Army Corps of Engineers.

A Proclamation establishing a national monument under the Antiquities Act can be likened to substantive agency rulemaking under the Administrative Procedure Act.  But whereas the former contains no language delegating legislative power to revoke or overhaul national monuments, the latter expressly defines agency rulemaking power to include the power to amend or repeal substantive rules.  5 U.S.C.A. § 551(5).  Congress understands the distinctions between creating, amending, and repealing substantive rules and uses distinctive statutory language accordingly.

The Government wrongly contends that implying presidential authority to revoke or eviscerate national monuments "puts the Executive on an equal footing with the Legislature…." (Mem. 32).  If Congress creates a national monument by statute, the monument can only be revoked or changed by a new statute.  In contrast, the Government's atextual interpretation of the Act would empower the President to revoke or change a monument without congressional action, putting the Executive on a superior footing to the Legislature.

The Government's reliance on legislative acquiescence is misconceived. (Mem. 32-36). First, there is no history of presidential mutilations of national monuments approaching President Trump's mutilation of Bears Ears.  The Government fails to identify even one comparable case. Second, there are no judicial decisions upholding presidential mutilations of national monuments to which Congress has acquiesced. Third, Congress has never voted on legislation that might imply a belief in presidential power to mutilate or materially alter national monument proclamations. Finally, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313 (1960).  "[I]t is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means." *Pierce v. Underwood*, 487 U.S. 552, 566 (1988).  "Thus, even when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of the statute that can be gleaned from its language and legislative history prior to its enactment." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980).   And subsequent legislative history here is not necessarily to the Government's advantage.  The Federal Land Policy and Management Act of 1976 declares that is shall be the policy of the United States that "the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action."  43 U.S.C.A. § 1701 (a) (4).  An accompanying Committee Report explains (H.R. Rep. No. 94-1163 at 9 (May 15, 1976): "[Section 204] would also specifically reserve to the Congress the authority to modify and revoke withdrawals for national monuments created under the Antiquities Act….These provisions will insure that the integrity of the great national resource management systems will remain under the control of the Congress."

The Antiquities Act does not implicate national security or foreign affairs where exceptional deference to the executive power might be appropriate.  See *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936).

### III.   CONCLUSION

For the reasons set forth above, this Court should invalidate President Trump's mutilation of the Bears Ears National Monument as unauthorized by the Antiquities Act and deny the Motion to Dismiss filed by Federal Defendants in this cause and grant such other and further relief as is deemed just and proper.

Respectfully submitted his _____ day of November 2018.

> *s/  Bruce  Fein*_____
> Bruce Fein, Esquire
> W. Bruce DelValle, Esquire
> **Fein & DelValle PLLC**
> 300 New Jersey Avenue NW, Suite 900
> Washington, D.C. 20001
> (office) 202-465-8727
> *Email:  bruce@feinpoints.com*
> *           brucedelvalle@gmail.com*
>
> **Counsel for *Amicus Curiae* Conservatives for Responsible Stewardship.**

### CERTIFICATE OF SERVICE

I hereby certify that on November _____, 2018, I electronically filed the foregoing *Amicus Curie* Brief of Conservatives for Responsible Stewardship in Support of Plaintiffs' Opposition to Motion to Dismiss, in Case Nos: 1:17-cv-02590 (TSC);  1:17-cv-02605 (TSC); and, 1:17-cv-02606 (TSC), with the Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system, which will serve all registered CM/ECF users.

> */s/ W. Bruce DelValle*_____
> W. Bruce DelValle, Bar No: 1520906

# Reduction of Bears Ears



Original national monument boundary

New boundaries

*Indian Creek*

*Bears Ears*

*Shash Jaa*

Original acres total    **1.35 million**
New acres total    **228,784**

Sources: U.S. Bureau of Land Management

# Reduction of Grand Staircase-Escalante



Original national monument boundary

New boundaries

*Escalante Canyons*

*Grand Staircase-Escalante*

*Kaiparowits*

*Grand Staircase*

Original acres total    **1.9 million**
New acres total    **1,006,341**

Sources: U.S. Bureau of Land Management

Exhibit "1"
Amicus in Opp. Mot. Dismiss
Case Nos: 17-cv-02590;  17-cv-02605; and, 1:17-cv-02606